UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - x

F/V SOFTWARE, L.L.C.,                         :

               Plaintiff,            :        Civil Action
                                       No. 05-11286-REK

         v.                              :

ASPEN TECHNOLOGY, INC.,               :

              Defendant.            :

- - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANT'S MOTION TO REASSIGN RELATED CASE

Defendant Aspen Technology, Inc. ("Aspen"), hereby respectfully moves, pursuant to Local Rule 40.1(G) of this Court, for an Order reassigning this action from this Session to the Session of the Honorable Patti B. Saris as related to Aspen Technology, Inc. v. F/V Software, L.L.C., Civ. No. 04-11830-PBS (D. Mass.).  As grounds for this motion, Aspen states as follows:

1.     This action is the second-filed of two related actions pending in two different Sessions of this Court.

2.     On August 23, 2004, Aspen commenced Aspen Technology, Inc. v. F/V Software, L.L.C., Civ. No. 04-11830-PBS (D. Mass.) (the "Aspen Action"), by filing in the United States District Court for the District of Massachusetts a Complaint for Declaratory Relief, a copy of which is attached hereto as Exhibit A.  The action concerns Aspen's and F/V Software, L.L.C.'s ("F/V's") respective rights and performance under a June 15, 2001 registration rights agreement.

3.      Eight days after the Aspen Action was filed, and in response to the Aspen Action, F/V filed a Complaint for Breach of Contract against Aspen in the United States District Court for the Eastern District of Louisiana.  F/V Software, L.L.C. v. Aspen Technology, Inc., Civ. No. 04-2485 (E.D. La.) (the "F/V Action"), a copy of which is attached hereto as Exhibit B.  The F/V Action also involves the parties' respective rights and performance under the June 15, 2001 registration rights agreement.

4.      On June 13, 2005, the Court in the Eastern District of Louisiana, upon motion by F/V and consent of Aspen, transferred the F/V Action to this District.  In the Transfer Order (docket entry number 11 in this action), the Louisiana Court expressly held that the two actions "involve[] the same parties, issues, and facts."  Id. at 1. Nevertheless, because neither F/V nor the Louisiana Court advised the Clerk of this Court that the F/V Action was a "related" case as per Local Rule 40.1(G), the F/V Action was assigned randomly in this District.

5.      Under D. Mass. Local Rule 40.1(G):

> a civil case is related to one previously filed in this court if some or all of the parties are the same and if one or more of the following similarities exist also:  the cases involve the same or similar claims or defenses; or the cases involve the same property, transaction or event . . . or the cases involve substantially the same questions of fact or law.

LR, D. Mass. 40.1(G).  Here, the two cases involve the same parties (F/V and Aspen), the same claims and anticipated defenses (relating to breach of contract), the same transaction, and the same questions of fact and law (such as Aspen's obligations under the registration rights agreement, whether it breached any such obligations, and the causal connection, if any, between any alleged breach and F/V's supposed injury).  As noted

above, a federal court has already found that the two actions "involve[] the same parties, issues, and facts." See supra ¶ 4.

WHEREFORE, Aspen respectfully requests that the Court allow its Motion To Reassign Related Case and grant such other and further relief as this Court deems just and proper. A copy of this motion has been filed today with Judge Saris in Aspen Technology, Inc. v. F/V Software, L.L.C., Civ. No. 04-11830-PBS pursuant to a Notice Of Motion To Reassign Related Case.

Dated: October 20, 2005
      Boston, Massachusetts

Respectfully submitted,

/s/ Justin J. Daniels
Thomas J. Dougherty (BBO #132300)
Justin J. Daniels (BBO #656118)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Beacon Street
Boston, Massachusetts 02108
(617) 573-4800

Counsel for Defendant Aspen Technology, Inc.

**Local Rule 7.1 Certification**

The undersigned hereby certifies that counsel for Aspen contacted counsel for F/V Software on October 17, 2005, in an effort to resolve the issues in this motion. However, F/V did not consent to the relief requested herein.

Dated: October 20, 2005

/s/ Justin J. Daniels
Justin J. Daniels

# EXHIBIT A

RECEIPT # 53159
AMOUNT $
SUMMONS ISSUED_____/
LOCAL RULE 4.1_____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK._____
DATE_____ 8-23-04

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - x

ASPEN TECHNOLOGY, INC.,                 :

     Plaintiff,                 :        Civil Action
               No.

    v.                 :        **04 - 11830 PBS**

F/V SOFTWARE, L.L.C.,                 :

     Defendant.                 :        MAGISTRATE JUDGE Alexander

- - - - - - - - - - - - - - - - - - - - - - - - x

## COMPLAINT FOR DECLARATORY RELIEF

   Plaintiff Aspen Technology, Inc. ("Aspen"), by its undersigned attorneys,

brings this action against Defendant F/V Software, L.L.C. ("Defendant"), and alleges

upon knowledge with respect to itself and its own acts and upon information and belief

with respect to all other matters, as follows:

### Nature Of The Action

   1.  By this action, Aspen seeks a declaratory judgment to settle a live

controversy between the parties relating to Aspen's performance of certain obligations

under a Registration Rights Agreement ("RRA"), executed on June 15, 2001 between

Aspen and Defendant (among others), in connection with an asset-purchase transaction in

which Defendant received nearly 100,000 shares of unregistered Aspen common stock.

(A copy of the RRA is attached hereto as Exhibit A and incorporated herein by reference.)

   2.  In the RRA, Aspen agreed to "provide for certain arrangements

with respect to the registration of those shares under the Securities Act of 1933." The

relevant "arrangements" are set forth in §§ 2.1 and 2.3 of the RRA. Until the stock

registration was declared "effective" by the Securities and Exchange Commission

("SEC"), which occurred on December 14, 2001, Defendant could not sell its shares on the public markets.

      3.      On August 11, 2004, Aspen received a letter from a Louisiana attorney named Eugene G. Taggart, purporting to represent the Defendant. In the letter, Mr. Taggart stated his firm had been asked "to recover damages [Defendant] sustained from the failure of Aspen Technology, Inc. to perform a certain Registration Rights Agreement dated June 15, 2001" and that the "failure of Aspen Technology, Inc. to perform its obligations under the Registration Rights Agreement caused significant monetary damages to [Defendant]."

      4.      Upon information and belief, Defendant appears to be contending that the registration of Defendant's shares took longer than expected; that this extra delay was Aspen's fault; and that, as a result, Aspen now owes Defendant the difference between the price at which Defendant ultimately sold the stock and some other, presumably higher, price at which the stock would have been trading had the registration been declared effective when Defendant wanted.

      5.      Aspen flatly denies these charges and believes Defendant's apparent theory of damages is unfounded.

      6.      For example, upon information and belief, Defendant in fact made a substantial profit on the transaction, whereas Aspen lost money and was forced to write off the entire deal.

      7.      Aspen seeks to resolve this dispute now.

      8.      Accordingly, Aspen seeks a declaratory judgment that:

           (i)      Aspen fully performed its material obligations in the RRA;

2

(ii)     Aspen did not breach the RRA; and

(iii)    Any alleged "failure" on the part of Aspen to perform an

obligation under the RRA did not cause any of Defendant's alleged "damages."

## Parties

9.      Aspen is a publicly-traded company incorporated under the laws of the State of Delaware with its principal place of business in Cambridge, Massachusetts. It is a supplier of software and services to the process industries, such as chemical and energy. Aspen's solutions are used by companies to run their plants and supply chains.

10.     Upon information and belief, Defendant is a private equity investment holding company organized under the laws of the State of Louisiana with its principal place of business in New Orleans, Louisiana.

11.     Upon information and belief, Defendant was and is created and controlled by Frantzen/Voelker Investments, L.L.C., a private equity investment group.

## Jurisdiction

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1332 and 2201. The amount in controversy exceeds $75,000, exclusive of interest and costs, and there is diversity of citizenship.

13.     Defendant is subject to personal jurisdiction within the Commonwealth of Massachusetts because, among other reasons, it has transacted business within Massachusetts; it has derived substantial benefit and revenue from contracts negotiated in, executed in, and governed by the laws of the Commonwealth of Massachusetts; and it has threatened litigation against a Massachusetts resident while in Massachusetts.

3

## Venue

14.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(a).

## Facts

### *March 2001 - June 14, 2001: The Negotiations*

15.     In the spring of 2001, representatives from Aspen and Defendant, among others, initiated negotiations for the possible purchase by Aspen of one of the business units (the "PAI Business") of a company called Computer Processes Unlimited, LLC ("CPU"), which at the time was controlled by Defendant's parent company Frantzen/Voelker Investments, L.L.C. and another venture capital company named Advantage Capital Management.

16.     To lead the negotiations, the Management Committee of CPU appointed David Erath, one of Frantzen/Voelker Investments, L.L.C.'s top executives and a principal owner of Defendant.

17.     Mr. Erath is a sophisticated businessperson, seasoned negotiator and has years of investment experience. Over the course of his career, Mr. Erath has negotiated deals nearing half a billion dollars in value.

18.     Also representing Defendant in the negotiations was the venture capitalist Crichton Brown of Advantage Capital Management.

19.     Also representing Defendant in the negotiations was the law firm of Sher Garner Cahill Richter Klein McAlister & Hilbert, L.L.C. ("Sher Garner"), one of the top law firms in New Orleans. Among Sher Garner's many areas of expertise is securities law where, upon information and belief, it has experience in public offerings, private placements and compliance with complex state and Federal laws and regulations,

4

as well as representing clients in proceedings before state and Federal regulatory agencies.

20.    Sher Garner was the primary contact for Aspen's attorneys in negotiating the RRA.

21.    The negotiations themselves were intense and compromises were made on both sides. Many drafts of the agreements were exchanged, including at least nine drafts of the RRA.

22.    Prior to the closing, Defendant signed and submitted an "Investment Representation Letter," under which it represented that it had "adequate opportunity to obtain from representatives of Aspen such information about Aspen as is necessary for the [Defendant] to evaluate the merits and risks of [Defendant's] acquisition of the Shares"; that it was an "'accredited investor' as defined by Rule 501(a) under the Securities Act [of 1933]"; and that it had "sufficient expertise in business and financial matters to evaluate the risks involved . . . and to make an informed investment decision with respect to [the] acquisition."

23.    Between March 1, 2001 and June 14, 2001, prior to the closing of the transaction, Aspen common stock was trading between a high of $30.00 per share and a low of $11.88 per share.

### *June 15, 2001: The Closing*

24.    On June 15, 2001, the transaction closed and Aspen purchased the PAI Business from Coppermine LLC ("Coppermine"), a wholly-owned subsidiary of CPU created for purposes of the acquisition.

25.    The purchase itself was embodied in a "Membership Interest Purchase Agreement" ("Purchase Agreement"), signed by the three corporate entities

Aspen, CPU and Coppermine. Defendant was not a party to the Purchase Agreement, nor was it a contemplated beneficiary.

26.    Under the terms of the Purchase Agreement, CPU conveyed all of its interest in Coppermine to Aspen in exchange for approximately 400,000 unregistered shares of Aspen common stock. Defendant received Aspen unregistered stock as "designees for CPU" as a "distribution, without consideration."

27.    Another of the agreements executed at the closing was the RRA, to which Aspen and Defendant both were parties.

28.    By its terms, the RRA is governed by and construed in accordance with the laws of the Commonwealth of Massachusetts. See RRA § 4.4.

29.    In addition, the RRA is a fully-integrated contract which, by its terms, "constitutes the entire agreement, and supersedes all other prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof." See RRA § 4.3.

30.    Under the RRA, Aspen agreed to "provide for certain arrangements with respect to the registration of [the shares] under the Securities Act of 1933."

31.    To the extent Aspen made any representations or promises to Defendant about whether or when the registration statement for the shares received by Defendant would be declared effective by the SEC, or Aspen's ability to have the registration statement declared effective, those representations or promises would have been contained in the RRA.

6

32.    In relevant respects, the RRA states as follows:

1.  CERTAIN DEFINITIONS

*    *    *

"REGISTRATION STATEMENT" means a registration statement filed by
Aspen with the Commission for a public offering and sale of
securities of Aspen (other than a registration statement on Form
S-8 or Form S-4, or their successors, or any other form for a
similar limited purpose, or any registration statement covering
only securities proposed to be issued in exchange for securities
or assets of another corporation).

*    *    *

2.  REGISTRATION RIGHTS

2.1.  INITIAL REGISTRATION

(a) TIMING OF INITIAL REGISTRATION. Subject to Section
2.1(b), Aspen shall file, by June 15, 2001, a shelf Registration
Statement on Form S-3 (the "Initial Registration") to register
368,461 of the shares of Aspen Common issued to the Stockholders
pursuant to the Purchase Agreement, which shares shall be
registered for offering by the Stockholders in the respective
numbers set forth in Schedule I hereto. Thereupon, Aspen shall
comply with the registration procedures of Section 2.3 with
respect to the Initial Registration.

(b) DEFERRAL OF INITIAL REGISTRATION. If at the time of the
Initial Registration pursuant to Section 2.1(a),

(i)    Aspen is engaged (or Aspen's Board of Directors
has determined in good faith to engage within 90
days of the time of the Initial Registration) in
a registered public offering of securities for
its own account or any other activity that, in
the good faith determination of Aspen's Board of
Directors, would be adversely affected by the
Initial Registration, and

(ii)   Aspen's Board of Directors determines in good
faith, by appropriate resolutions, that, as a
result of such offering or other activity, (A) it
would be detrimental to Aspen (other than as
relating solely to the price of the Aspen Common)
to file the Initial Registration at such time and
(B) it is in the best interests of Aspen to defer
proceeding with the Initial Registration at such
time,

then Aspen may direct that the filing of the Initial Registration
be delayed for a period not to exceed (x) 120 days from the date
on which Aspen provides such direction or (y) the period during
which (in the good faith determination of Aspen's Board of
Directors) filing the Initial Registration would be detrimental to
Aspen, whichever occurs first. This right to delay filing the
Initial Registration may not be exercised by Aspen more than once.
Aspen represents and warrants to the Stockholders that, as of the
date hereof, there are no facts that would form the basis of a

7

good faith determination by the Board of Directors pursuant to
this Section 2.1(b) to delay filing the Initial Registration.

(c) SUSPENSION OF INITIAL REGISTRATION. Aspen shall
maintain the effectiveness of the Initial Registration for a
period of 90 days after it has been first declared effective by
the Commission, PROVIDED that if, as of the final date of such 90-
day period, any other secondary shelf Registration Statement on
Form S-3 of Aspen is effective, Aspen shall continue to maintain
the effectiveness of the Initial Registration until such date as
of which no other such secondary shelf Registration Statement is
in effect. Notwithstanding the foregoing, Aspen may, by written
notice to the Stockholders, suspend or withdraw any such
Registration Statement and require that the Stockholders
immediately cease the sale of shares of Aspen pursuant thereto if:

    (i)    Aspen is engaged in any activity or transaction
or preparations or negotiations for any activity
or transaction that Aspen desires to keep
confidential for business reasons, and Aspen's
Board of Directors determines in good faith, by
appropriate resolutions, that the public
disclosure requirements imposed on Aspen pursuant
to such Registration Statement would require
disclosure of such activity or transaction;

    (ii)    Aspen files a Registration Statement with the
Commission for the purpose of registering under
the Securities Act, any securities to be publicly
offered and sold by Aspen; or

    (iii)    Aspen fails to satisfy the requirements for use
of Form S-3, as set forth in the general
instructions to Form S-3.

Upon receipt of such notice, each Stockholder shall immediately
discontinue any sales of Registrable Shares pursuant to the
Initial Registration until such Stockholder has received copies of
a supplemented or amended Prospectus or until such Stockholder is
advised in writing by Aspen that the then-current Prospectus may
be used and has received copies of any additional or supplemental
filings that are incorporated or deemed incorporated by reference
in such Prospectus.

*    *    *

2.3. REGISTRATION PROCEDURES

(a) GENERAL. If and whenever Aspen is required by the
provisions of this Agreement to use its best efforts to effect the
registration of any Registrable Shares under the Securities Act,
Aspen shall:

    (i)    prepare and file with the Commission a
Registration Statement (including the Initial
Registration) on an appropriate form as
expeditiously as possible, and cause such
Registration Statement to be declared effective
by the Commission at the earliest practicable
date;

    (ii)    as expeditiously as possible prepare and file
with the Commission any amendments and

> supplements to the Registration Statement and the
> Prospectus included in the Registration Statement
> as may be necessary to comply with the provisions
> of the Securities Act (including the anti-fraud
> provisions thereof) and to keep the Registration
> Statement effective for at least 90 days from the
> effective date (or, in the case of the Initial
> Registration, for the period specified in Section
> 2.1(c)) or such lesser period until all such
> Registrable Shares are sold; [and]
>
>         \*   \*   \*
>
> (vii)  promptly make available for inspection by the
>        Selling Stockholders, any managing underwriter
>        participating in any disposition pursuant to such
>        Registration Statement, and any attorney or
>        accountant or other agent retained by any such
>        underwriter or selected by the Selling
>        Stockholders, all financial and other records,
>        pertinent corporate documents and properties of
>        Aspen and cause Aspen's officers, directors,
>        employees and independent accountants to supply
>        all information reasonably requested by any such
>        seller, underwriter, attorney, accountant or
>        agent in connection with such Registration
>        Statement.

33.    The RRA contained no promise or guarantee about when the registration would become effective.

34.    The RRA contained no promise or guarantee that Aspen was necessarily eligible to use the Form S-3 registration process (which usually takes less time than the other methods of registration). In fact, the RRA specifically contemplated that Aspen may not be eligible to use Form S-3. See, e.g., RRA § 2.1(c)(iii).

35.    The RRA contained no promise or guarantee that the shares in Aspen were worth a particular price, or that they could be sold for a particular price or at a particular time.

### June 15 - August 14, 2001: Aspen's Efforts To Effect The Registration

36.    On June 15, 2001, as per the RRA, Aspen filed a Form S-3 Registration with the SEC and began the process of trying to effect the registration of the unregistered Aspen shares sold to CPU, including the shares distributed to Defendant by

CPU, pursuant to the terms of the RRA.

37.     From June 20, 2001 through July 6, 2001, Aspen's corporate counsel, Hale and Dorr LLP (now known as "Wilmer Cutler Pickering Hale and Dorr LLP) ("Hale and Dorr"), repeatedly contacted the SEC to obtain the name of the SEC staff examiner assigned to the Form S-3.

38.     On July 6, 2001, the SEC advised Hale and Dorr of the names of the reviewing accounting and corporation finance staff members. Immediately thereafter, Hale and Dorr left messages for both staff members, requesting information as to the SEC's plans with respect to its review of the Form S-3.

39.     On July 9, 2001, a SEC accounting staff member advised Hale and Dorr that in connection with the Form S-3 review, the accounting staff would be reviewing a March 9, 2001 letter that Aspen had submitted to the SEC in connection with the SEC's review of Aspen's Form 10-K and 10-Qs. Also, the SEC informed Hale and Dorr that its only comments to the Form S-3 would be those relating to the March 9, 2001 letter, and that these comments would be provided within approximately ten (10) business days.

40.     Ten business days later, on July 23, 2001, Hale and Dorr contacted the SEC to inquire as to status of its review.

41.     On July 24, 2001, the SEC faxed to Hale and Dorr a comment letter advising that Aspen should (1) disclose in a "recent developments" section the estimated amount of the restructuring charge to be taken by Aspen for the fiscal quarter ended June 30, 2001 (this information was incorporated by reference from the Form 10-Q for the fiscal quarter ended March 31, 2001, but apparently the staff thought it necessary

for Aspen to repeat the information in the body of the Form S-3 itself) and (2) confirm,

among other things, that Aspen's audited financial statements for the fiscal year ended

June 30, 2001 were not yet available.

      42.     The next day, July 25, 2001, Aspen responded in full to the SEC's

comments.

      43.     From July 31, 2001 through August 8, 2001, Hale and Dorr

repeatedly contacted the SEC to inquire as to status of the SEC's review of Aspen's July

25, 2001 response.

      44.     On August 9, 2001, the SEC faxed to Hale and Dorr a comment

letter requesting additional detail regarding the restructuring charge (apparently missing

the fact that a Current Report on Form 8-K filed on August 8, 2001 provided this

information and was incorporated by reference into the Form S-3).

      45.     On August 10, 2001, Hale and Dorr left a message for the SEC

corporation finance staff member assigned to the Form S-3 as to any need to file a second

Amendment No. 2, given the earlier filing of the Form 8-K.

      46.     Neither Hale and Dorr nor Aspen heard from the SEC between

August 10 and August 15, 2001.

      47.     At that time, Aspen common stock was trading between a high of

$17.14 per share and a low of $16.32 per share.

### *August 15, 2001 - October 15, 2001: The Suspension Of The Registration*

      48.     On August 15, 2001, as permitted by the RRA, Aspen's Board of

Directors adopted a vote as to the need to temporarily suspend the registration process in

light of a business activity (Aspen's negotiation to purchase the company, HyproTech,

which Aspen has since acquired) that the Board determined had to be kept confidential. See RRA § 2.1(c)(i).

49.     Aspen provided written notice of the suspension to Defendant shortly after August 15, 2001.

50.     Between August 15, 2001 and October 15, 2001, Aspen common stock was trading between a high of $17.33 per share and a low of $7.79 per share.

### October 15, 2001 – December 14, 2001: The Registration Is Completed

51.     On or about October 31, 2001, Hale and Dorr discovered that beneficial stock ownership information for one of its directors was inadvertently omitted from the preliminary and definitive proxy materials and that definitive proxy materials may have been filed one, or possibly two, days after the 120-day period following end of fiscal year.

52.     On November 2, 2001, Hale and Dorr submitted to SEC examiner Loryn Zerner a waiver request to retain Form S-3 eligibility despite these issues. Also, on November 8, 2001, Hale and Dorr submitted a waiver request to Patricia Miller of the SEC's Office of Chief Counsel.

53.     In response to Hale and Dorr's communications, Ms. Zerner requested that Aspen withdraw the Form S-3 filed on June 15, 2001 (which Aspen did on November 16, 2001), and then re-submit a new Form S-3 for SEC review.

54.     On November 21, 2001, although the Form S-3 had already been withdrawn, Patricia Miller of the SEC informed Hale and Dorr that its waiver request had been granted and instructed Hale and Dorr to inform the SEC examiner of the same.

55.     On November 26, 2001, Aspen filed a new Form S-3, and responded to the SEC's remaining comments three days later.

56.     Even though Aspen re-filed the Form S-3 as per the SEC's staff member's request, the SEC did not treat it as such, and instead continued the review process it had initiated in June 2001.

57.     Shortly thereafter, Hale and Dorr was informed by the SEC that it had concluded its review and was prepared to effectuate the Form S-3 registration.

58.     On December 12, 2001, Aspen requested that the SEC accelerate the effective date of the registration.

59.     On December 14, 2001, the SEC declared the Form S-3 registration effective.

60.     Pursuant to the RRA, starting on December 14, 2001, Defendant had a 90-day window within which the sell its shares of Aspen stock. See RRA § 2.3(ii). During this time, Aspen common stock was trading between a high of $22.45 per share and a low of $14.16 per share.

## The Present Dispute

61.     Upon information and belief, Defendant sold its shares of Aspen stock at a price lower than what it had hoped, and now expects Aspen to make up the difference, under the pretense that Aspen breached the RRA.

62.     It is Aspen's position that it fully performed its obligations under the RRA, did not cause any of Defendant's so-called "damages" and has no obligation, under the RRA or otherwise, to insure against Defendant's apparent belief that it lost money.

13

## COUNT ONE
### (Declaratory Relief: Aspen Did Not Breach The RRA)

63. Aspen repeats and realleges the averments set forth in paragraphs 1 through 62 above.

64. An actual controversy has arisen and now exists between Aspen and Defendant.

65. To resolve this controversy, Aspen requires a judicial determination of Aspen's performance of all material obligations under the RRA and a declaration that Aspen has fully performed all such obligations.

66. Such a declaration is necessary and appropriate at this time in order that Aspen may ascertain the respective rights and obligations of the parties.

67. Aspen therefore requests that the Court determine Aspen's actions with respect to performing the material obligations in the RRA fully satisfied and establish, inter alia, that:

    (i)    Aspen did not breach the RRA;

    (ii)    alternatively, that any failure by Aspen to satisfy all of its material obligations under the RRA has been excused;

    (iii)    alternatively, that any failure by Aspen to satisfy all of its material obligations under the RRA has been waived; or

    (iv)    alternatively, to the extent Aspen has failed to satisfy any of its material obligations under the RRA, that the performance of such obligations was rendered impossible and/or impracticable.

68. A declaration that Defendant is not entitled to damages in connection with their acquisition of shares of Aspen's stock will permanently resolve the controversy.

## COUNT TWO
**(Declaratory Relief: Aspen Did Not Cause Defendant's Alleged Injury)**

69.    Aspen repeats and realleges the averments set forth in paragraphs 1 through 68 above.

70.    An actual controversy has arisen and now exists between Aspen and Defendant.

71.    To resolve this controversy, Aspen requires a judicial determination of the causal relation, if any, between Aspen's actions or inactions with respect to the RRA and Defendant's alleged "damages."

72.    Such a declaration is necessary and appropriate at this time in order that Aspen may ascertain the respective rights and obligations of the parties.

73.    Aspen therefore requests that the Court determine that, to the extent it finds that Aspen failed to satisfy any of its material obligations under the RRA, the performance or non-performance of any such obligations was not the cause of Defendant's alleged "damages."

74.    A declaration that Defendant is not entitled to damages in connection with their acquisition of shares of Aspen's stock will permanently resolve the controversy.

15

WHEREFORE, Aspen prays for judgment as follows:

A.      For the declarations set forth above with respect to Counts One and

Two;

B.      For an Order awarding Aspen its attorneys' fees and costs incurred

herein; and

C.      For such other and further relief as the Court deems just and proper.

Dated: August 23, 2004                          Respectfully submitted,
       Boston, Massachusetts

Thomas J. Dougherty (BBO #132300)
Justin J. Daniels (BBO #656118)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
One Beacon Street
Boston, Massachusetts 02108
Telephone: (617) 573-4800

Counsel for Plaintiff
Aspen Technology, Inc.

16

JS 44 (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

ASPEN TECHNLOGY, INC.

**04 - 11830 PBS**

## DEFENDANTS

HYPROTECH SOFTWARE L.L.C.

**(b)** County of Residence of First Listed Plaintiff  Suffolk

(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____

(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address and Telephone Number)

Thomas J. Dougherty (BBO #132300)
Justin J. Daniels (BBO #656118)
Skadden, Arps, Slate, Meagher & Flom LLP
One Beacon Street
Boston, Massachusetts  02108
(617) 573-4800

Attorneys (If Known)

Eugene G. Taggart
Taggart, Morton, Ogden, Staub, Rougelot & O'Brien, L.L.C.
2100 Energy Centre, 1100 Poydras Street
New Orleans, Louisiana 70163
(504) 599-8500

## II. BASIS OF JURISDICTION  (Place an "X" in One Box Only)

☐ 1  U.S. Government
      Plaintiff

☐ 2  U.S. Government
      Defendant

☐ 3  Federal Question
      (U.S. Government Not a Party)

☒ 4  Diversity
      (Indicate Citizenship of Parties
      in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES  (Place an "X" in One Box for Plaintiff
and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT  (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☒ 160 Stockholders' Suits<br>☒ 190 Other Contract<br>☐ 195 Contract Product Liability | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury - Med. Malpractice<br>☐ 365 Personal Injury - Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC<br>☐ 630 Liquor Laws<br>☐ 640 R. R. & Truck<br>☐ 650 Airline Regs.<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act<br>☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS -Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights | ☐ 510 Motions to vacate Sentence<br>**HABEAS CORPUS:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | | | |

## V. ORIGIN  (PLACE AN "X" IN ONE BOX ONLY)

☒ 1  Original
      Proceeding

☐ 2  Removed from
      State Court

☐ 3  Remanded from
      Appellate Court

☐ 4  Reinstated or
      Reopened

☐ 5  Transferred from
      another district
      (specify)

☐ 6  Multidistrict
      Litigation

☐ 7  Appeal to
      District
      Judge from
      Magistrate
      Judgment

## VI. CAUSE OF ACTION  (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause.
Do not cite jurisdictional statutes unless diversity.)

28 U.S.C. §§ 1332 and 2201.  Declaratory judgment action to resolve controversy over plaintiff's performance of registration rights agreement.

## VII. REQUESTED IN
COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

**DEMAND $**
Declaratory Relief

CHECK YES only if demanded in complaint:

JURY DEMAND:    ☐ YES    ☒ NO

## VIII. RELATED CASE(S)
IF ANY

(see instructions):

JUDGE  N/A

DOCKET NUMBER  N/A

DATE

August 23, 2004

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

American LegalNet, Inc.    www.USCourtForms.com

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1.  Title of case (name of first party on each side only)  Aspen Technology, Inc. v. F/V Software, L.L.C.

2.  Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See

    local rule 40.1(a)(1)).

    [ ]  I.   160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

    [ ]  II.  195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,          *Also complete AO 120 or AO 121
              740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.            for patent, trademark or copyright cases

    [✔] III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
              315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
              380, 385, 450, 891.

    [ ]  IV.  220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
              690, 810, 861-865, 870, 871, 875, 900.

    [ ]  V.   150, 152, 153.

04 - 11830 PBS

3.  Title and number, if any, of related cases.  (See local rule 40.1(g)).  If more than one prior related case has been filed in
    this district please indicate the title and number of the first filed case in this court.

    N/A

4.  Has a prior action between the same parties and based on the same claim ever been filed in this court?

                                                          YES [ ]      NO [✔]

5.  Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See
    28 USC §2403)

                                                          YES [ ]      NO [✔]

    If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

                                                          YES [ ]      NO [ ]

6.  Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

                                                          YES [ ]      NO [✔]

7.  Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of
    Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule
    40.1(d)).

                                                          YES [✔]      NO [ ]

    A.  If yes, in which division do all of the non-governmental parties reside?

        Eastern Division  [✔]      Central Division  [ ]      Western Division  [ ]

    B.  If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental
        agencies, residing in Massachusetts reside?

        Eastern Division  [ ]      Central Division  [ ]      Western Division  [ ]

8.  If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If
    yes, submit a separate sheet identifying the motions)

                                                          YES [ ]      NO [ ]

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME   Thomas J. Dougherty; Justin J. Daniels

ADDRESS   Skadden, Arps, Slate, Meagher & Flom LLP, One Beacon Street, Boston, Massachusetts  02108

TELEPHONE NO.   (617) 573-4800

(Coversheetlocal.wpd - 10/17/02)



```
<DOCUMENT>
<TYPE>EX-99.1
<SEQUENCE>4
<FILENAME>b39725atex99-1.txt
<DESCRIPTION>REGISTRATION RIGHT AGREEMENT DATED JUNE 15TH 2001
<TEXT>
<PAGE>    1
```

EXHIBIT 99.1

REGISTRATION RIGHTS AGREEMENT

THIS REGISTRATION RIGHTS AGREEMENT dated as of June 15, 2001 is entered into between Aspen Technology, Inc., a Delaware corporation ("Aspen"), and the several persons and entities identified as "Stockholders" on the signature pages hereto (collectively, the "Stockholders").

PRELIMINARY STATEMENT

A. This Agreement is being entered into in connection with the Membership Interest Purchase Agreement dated as of the date hereof (the "Purchase Agreement") among Aspen, Coppermine LLC ("Coppermine") and Computerized Processes Unlimited, L.L.C. ("CPU").

B. Pursuant to the Purchase Agreement, among other things, (1) Aspen is purchasing CPU's entire membership interest in Coppermine and, in consideration therefor, is issuing shares of its common stock to the Stockholders, as the designees of CPU, and (2) Aspen is agreeing to provide for certain arrangements with respect to the registration of those shares under the Securities Act of 1933.

C. The parties hereto desire to establish the terms and conditions pursuant to which registration will be effected.

NOW, THEREFORE, in consideration of the premises herein contained, the parties hereby agree as follows:

1.  CERTAIN DEFINITIONS

As used in this Agreement, the following terms shall have the following respective meanings:

"ASPEN COMMON" means the common stock, $.10 par value per share, of Aspen.

"BUSINESS DAY" means any day that the Securities and Exchange Commission is open and conducting business.

"COMMISSION" means the Securities and Exchange Commission, or any other federal agency at the time administering the Securities Act.

"EMPLOYEE STOCKHOLDERS" means Marcus Chevis and Clayton J. White.

"EXCHANGE ACT" means the Securities Exchange Act of 1934, as amended, or any successor federal statute, and the rules and regulations of the Commission issued under such Act, as they each may, from time to time, be in effect.

"PROSPECTUS" means the prospectus included in any Registration Statement, as amended or supplemented by an amendment or prospectus supplement, including post-effective amendments, and all material incorporated by reference or deemed to be incorporated by reference in such Prospectus.

"REGISTRATION STATEMENT" means a registration statement filed by Aspen with the Commission for a public offering and sale of securities of Aspen (other than a registration statement on Form S-8 or Form S-4, or their successors, or any other form for a similar limited purpose, or any registration statement covering only securities proposed to be issued in exchange for securities or assets of another corporation).

"REGISTRATION EXPENSES" means the expenses described in Section 2.4.

"REGISTRABLE SHARES" means, with respect to a Stockholder, (a) the number of shares of Aspen Common issued to such Stockholder pursuant to the Purchase Agreement and set forth opposite such Stockholder's name in Schedule I hereto (including shares initially deposited in escrow pursuant to the terms of the Purchase Agreement and subsequently delivered to such Stockholder), (b) any other securities issued by Aspen in exchange for any of such shares of Aspen Common (but, with respect to any particular Registrable Share, only so long as it continues to be a Registrable Share) and (c) any shares of Aspen Common issued as a dividend or distribution on account of Registrable Shares or resulting from a subdivision of outstanding Registrable Shares into a greater number of shares (by reclassification, stock split or otherwise); PROVIDED that a security that was at one time a Registrable Share shall cease to be a Registrable Share when (i) it has been effectively registered and sold pursuant to a Registration Statement or (ii) it has been transferred and is no longer held of record by a Stockholder.

"SECURITIES ACT" means the Securities Act of 1933, as amended, or any successor federal statute, and the rules and regulations of the Commission issued under such Act, as they each may, from time to time, be in effect.

"SELLING STOCKHOLDER" means any Stockholder owning Registrable Shares included in a Registration Statement.

"STOCKHOLDERS" means the Stockholders and any other persons or entities constituting Stockholders pursuant to Section 3.

2.  REGISTRATION RIGHTS

   2.1.  INITIAL REGISTRATION

      (a) TIMING OF INITIAL REGISTRATION. Subject to Section 2.1(b), Aspen shall file, by June 15, 2001, a shelf Registration Statement on Form S-3 (the "Initial Registration") to register 368,461 of the shares of Aspen Common issued to the Stockholders pursuant to the Purchase Agreement, which shares shall be registered for offering by the Stockholders in the respective numbers set forth in Schedule I hereto. Thereupon, Aspen shall comply with the registration procedures of Section 2.3 with respect to the Initial Registration.

      (b) DEFERRAL OF INITIAL REGISTRATION. If at the time of the Initial Registration pursuant to Section 2.1(a),

            (i) Aspen is engaged (or Aspen's Board of Directors has determined in good faith to engage within 90 days of the time of the Initial Registration) in a registered public offering of securities for its own account or any other activity that, in the good faith determination of Aspen's Board of Directors, would be adversely affected by the Initial Registration, and

            (ii) Aspen's Board of Directors determines in good faith, by appropriate resolutions, that, as a result of such offering or other activity, (A) it would be detrimental to Aspen (other than as relating solely to the price of the Aspen Common) to file the Initial Registration at such time and (B) it is in the best interests of Aspen to defer proceeding with the Initial Registration at such time,

then Aspen may direct that the filing of the Initial Registration be delayed for a period not to exceed (x) 120 days from the date on which Aspen provides such direction or (y) the period during which (in the good faith determination of Aspen's Board of Directors) filing the Initial Registration would be detrimental to Aspen, whichever occurs first. This right to delay filing the Initial Registration may

-2-

not be exercised by Aspen more than once. Aspen represents and warrants to the Stockholders that, as of the date hereof, there are no facts that would form the basis of a good faith determination by the Board of Directors pursuant to this Section 2.1(b) to delay filing the Initial Registration.

(c) SUSPENSION OF INITIAL REGISTRATION. Aspen shall maintain the effectiveness of the Initial Registration for a period of 90 days after it has been first declared effective by the Commission, PROVIDED that if, as of the final date of such 90-day period, any other secondary shelf Registration Statement on Form S-3 of Aspen is effective, Aspen shall continue to maintain the effectiveness of the Initial Registration until such date as of which no other such secondary shelf Registration Statement is in effect. Notwithstanding the foregoing, Aspen may, by written notice to the Stockholders, suspend or withdraw any such Registration Statement and require that the Stockholders immediately cease the sale of shares of Aspen pursuant thereto if:

(i) Aspen is engaged in any activity or transaction or preparations or negotiations for any activity or transaction that Aspen desires to keep confidential for business reasons, and Aspen's Board of Directors determines in good faith, by appropriate resolutions, that the public disclosure requirements imposed on Aspen pursuant to such Registration Statement would require disclosure of such activity or transaction;

(ii) Aspen files a Registration Statement with the Commission for the purpose of registering under the Securities Act, any securities to be publicly offered and sold by Aspen; or

(iii) Aspen fails to satisfy the requirements for use of Form S-3, as set forth in the general instructions to Form S-3.

Upon receipt of such notice, each Stockholder shall immediately discontinue any sales of Registrable Shares pursuant to the Initial Registration until such Stockholder has received copies of a supplemented or amended Prospectus or until such Stockholder is advised in writing by Aspen that the then-current Prospectus may be used and has received copies of any additional or supplemental filings that are incorporated or deemed incorporated by reference in such Prospectus.

(d) SALES THROUGH MARKET MAKERS. The Stockholders agree that, during the first ten trading days after the effective date of the Initial Registration, any trades of Registrable Shares under the Initial Registration shall be effected through First Union Securities, Inc. as broker, which shall work with Herzog, Heine & Geduld Inc. to sell such Registrable Shares in accordance with reasonable pricing parameters set forth by Stockholders based on then-current market conditions. Notwithstanding the foregoing, if any of such Registrable Shares are not sold within such ten trading days, the Stockholders may, elect to effect trades of those remaining shares through Merrill Lynch or, with the consent of Aspen (which consent shall not be unreasonably withheld), through a different brokerage firm that serves as a market maker for Aspen Common.

2.2. PIGGYBACK REGISTRATION

(a) REQUEST FOR INCLUSION AND BEST EFFORTS. If Aspen determines to file a Registration Statement for an underwritten public offering (a "Piggyback Registration"), then Aspen shall promptly, prior to such filing, provide written notice to all Stockholders of its intention to do so, PROVIDED that no such notice is required to be given if no Registrable Shares are to be included therein as a result of a determination of the managing underwriter pursuant to Section 2.2(b). Upon the written request of a Stockholder or Stockholders given within 20 days after Aspen provides such notice (which request shall state the intended method of disposition of such Registrable Shares), Aspen shall use its best efforts to cause all Registrable Shares that Aspen has been requested by such Stockholder or

Stockholders to register to be registered under the Securities Act to the extent necessary to permit their sale or other disposition in accordance with the intended methods of distribution specified in the request of such Stockholder or Stockholders, PROVIDED that Aspen shall have the right to postpone or withdraw any registration effected pursuant to this Section 2.2 without obligation to any Stockholder.

(b) UNDERWRITING. The right of any Stockholder to include its Registrable Shares in such registration pursuant to Section 2.2 shall be conditioned upon such Stockholder's participation in the contemplated underwritten public offering on the terms set forth in this Agreement. All Stockholders proposing to distribute their securities through such underwriting shall enter into an underwriting agreement in customary form with the underwriter or underwriters selected for the underwriting by Aspen. Notwithstanding any other provision of this Section 2.2, if the managing underwriters determine that the inclusion of all shares requested to be registered would adversely affect the offering, then Aspen may limit the number of Registrable Shares to be included in the Piggyback Registration and shall so advise all holders of Registrable Shares requesting registration. The number of shares that are entitled to be included in the registration and underwriting shall be allocated in the following manner:

(i) The securities of Aspen held by holders other than Stockholders and other holders of securities of Aspen who are entitled, by contract with Aspen, to have their securities included in such registration (each an "Other Holder") shall be excluded from such Piggyback Registration to the extent deemed advisable by the managing underwriters, and, if a further limitation on the number of shares is required, then the number of shares that may be included in such Piggyback Registration shall be allocated PRO RATA (on an as-converted basis) among all Stockholders and Other Holders requesting registration in accordance with the respective number of shares of Aspen Common held when Aspen provides notice as specified in Section 2.2(a).

(ii) If any Stockholder or Other Holder is entitled to include more securities than such Stockholder or Other Holder requested to be registered, then the excess securities shall be allocated among other requesting Stockholders and Other Holders pro rata in the manner described in the preceding clause (i).

If any holder of Registrable Shares or Other Holder disapproves of the terms of any such underwriting, such person may elect to withdraw therefrom by written notice to Aspen, and any Registrable Shares or other securities excluded or withdrawn from such underwriting shall be withdrawn from such registration.

2.3. REGISTRATION PROCEDURES

(a) GENERAL. If and whenever Aspen is required by the provisions of this Agreement to use its best efforts to effect the registration of any Registrable Shares under the Securities Act, Aspen shall:

(i) prepare and file with the Commission a Registration Statement (including the Initial Registration) on an appropriate form as expeditiously as possible, and cause such Registration Statement to be declared effective by the Commission at the earliest practicable date;

(ii) as expeditiously as possible prepare and file with the Commission any amendments and supplements to the Registration Statement and the Prospectus included in the Registration Statement as may be necessary to comply with the provisions of the Securities Act (including the anti-fraud provisions thereof) and to keep the Registration Statement effective for at least 90 days from the effective date (or, in the

-4-

case of the Initial Registration, for the period specified in Section 2.1(c)) or such lesser period until all such Registrable Shares are sold;

(iii) as expeditiously as possible furnish to each Selling Stockholder such reasonable numbers of copies of the Prospectus, including any preliminary Prospectus, in conformity with the requirements of the Securities Act, and such other documents as such Selling Stockholder may reasonably request in order to facilitate the public sale or other disposition of the Registrable Shares owned by such Selling Stockholder;

(iv) as expeditiously as possible use its best efforts to register or qualify the Registrable Shares covered by the Registration Statement under the securities or Blue Sky laws of such states as the Selling Stockholders shall reasonably request, and do any and all other acts and things that may be necessary or desirable to enable the Selling Stockholders to consummate the public sale or other disposition in such states of the Registrable Shares owned by the Selling Stockholder, PROVIDED that Aspen shall not be required in connection with this paragraph (iv) to qualify as a foreign corporation or execute a general consent to service of process in any jurisdiction;

(v) prior to the effective date of the Registration Statement, cause all such Registrable Shares to be listed on each securities exchange or automated or inter-dealer quotation system on which similar securities issued by Aspen are then listed;

(vi) promptly provide a transfer agent and registrar for all such Registrable Shares no later than the effective date of such Registration Statement;

(vii) promptly make available for inspection by the Selling Stockholders, any managing underwriter participating in any disposition pursuant to such Registration Statement, and any attorney or accountant or other agent retained by any such underwriter or selected by the Selling Stockholders, all financial and other records, pertinent corporate documents and properties of Aspen and cause Aspen's officers, directors, employees and independent accountants to supply all information reasonably requested by any such seller, underwriter, attorney, accountant or agent in connection with such Registration Statement;

(viii) as expeditiously as possible, notify each Selling Stockholder at any time when a Prospectus relating to the Registration Statement is required to be delivered under the Securities Act, of the happening of any event as a result of which the Prospectus included in such Registration Statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statement therein not misleading or incomplete in light of the circumstances then existing, and promptly amend the Registration Statement and/or related Prospectus to correct such untrue statement or to include the omitted information;

(ix) as expeditiously as possible, notify each Selling Stockholder, promptly after it shall receive notice thereof, of the time when such Registration Statement has become effective or a supplement to any Prospectus forming a part of such Registration Statement has been filed; and

(x) as expeditiously as possible following the effectiveness of such Registration Statement, notify each seller of such Registrable Shares of any stop order, order of

formal or informal investigation or any request by the
Commission for the amending or supplementing of such
Registration Statement or Prospectus.

(b) PROSPECTIVE AMENDMENTS. If Aspen has delivered a Prospectus to the
Selling Stockholders and after having done so the Prospectus is amended to
comply with the requirements of the Securities Act, Aspen shall, as
expeditiously as possible, notify the Selling Stockholders and, if
requested, the Selling Stockholders shall immediately cease making offers
of Registrable Shares and return all Prospectuses to Aspen. Aspen shall, as
expeditiously as possible, provide the Selling Stockholders with revised
Prospectuses and, following receipt of the revised Prospectuses, the
Selling Stockholders shall be free to resume making offers of the
Registrable Shares.

2.4. ALLOCATION OF EXPENSES. Aspen will pay all Registration Expenses for
all registrations under this Agreement. For purposes of this Section, the term
"Registration Expenses" shall mean all expenses incurred in effecting any
registration pursuant to this Agreement, including all registration and filing
fees, exchange listing fees, printing expenses, fees and expenses of counsel and
accountants for Aspen, state Blue Sky fees and expenses, and the expense of any
regular or special audits incident to or required by any such registration, but
excluding underwriting discounts, selling commissions and the fees and expenses
of Selling Stockholders' own counsel.

2.5. INDEMNIFICATION AND CONTRIBUTION.

(a) INDEMNIFICATION BY ASPEN. In the event of any registration of any
of the Registrable Shares under the Securities Act pursuant to this
Agreement, Aspen will indemnify and hold harmless each Selling Stockholder,
each underwriter of such Registrable Shares, and each other person, if any,
who controls such Selling Stockholder or underwriter within the meaning of
the Securities Act or the Exchange Act, with respect to each registration,
qualification or compliance effected pursuant to this Section 2, against
any losses, claims, damages, liabilities (or actions, proceedings or
settlements in respect thereof), joint or several, to which such Selling
Stockholder, underwriter or controlling person may become subject under the
Securities Act, the Exchange Act, state securities or Blue Sky laws or
otherwise, insofar as such losses, claims, damages or liabilities (or
actions, proceedings or settlements in respect thereof) arise out of or are
based upon any untrue statement or alleged untrue statement of any material
fact contained in any Registration Statement under which such Registrable
Shares were registered under the Securities Act, any preliminary prospectus
or final prospectus contained in the Registration Statement, or any
amendment or supplement to such Registration Statement, incident to any
such registration, qualification or compliance, or arise out of or are
based upon the omission or alleged omission to state a material fact
required to be stated therein or necessary to make the statements therein
not misleading; or any violation by Aspen of the Securities Act or Exchange
Act or any rule or regulation thereunder applicable to Aspen and relating
to action or inaction required by Aspen in connection with any such
registration, qualification or compliance; and Aspen will reimburse such
Selling Stockholder, underwriter and each such controlling person for any
legal or any other expenses reasonably incurred by such Selling
Stockholder, underwriter or controlling person in connection with
investigating or defending any such loss, claim, damage, liability or
action; PROVIDED, HOWEVER, that Aspen will not be liable in any such case
to the extent that any such loss, claim, damage or liability arises out of
or is based upon any untrue statement or omission made in such Registration
Statement, preliminary prospectus or prospectus, or any such amendment or
supplement, in reliance upon and in conformity with written information
furnished to Aspen; by or on behalf of such Selling Stockholder,
underwriter or controlling person and stated to be specifically for use in
the preparation thereof.

(b) INDEMNIFICATION BY SELLING STOCKHOLDERS. In the event of any
registration of any of the Registrable Shares under the Securities Act
pursuant to this Agreement, each Selling Stockholder,

-6-

severally and not jointly, will indemnify and hold harmless Aspen, each of
its directors and officers and each underwriter (if any) and each person,
if any, who controls Aspen or any such underwriter within the meaning of
the Securities Act or the Exchange Act, against any losses, claims, damages
or liabilities, joint or several, to which Aspen, such directors and
officers, underwriter or controlling person may become subject under the
Securities Act, Exchange Act, state securities or Blue Sky laws or
otherwise, insofar as such losses, claims, damages or liabilities (or
actions in respect thereof) arise out of or are based upon any untrue
statement or alleged untrue statement of a material fact contained in any
Registration Statement under which such Registrable Shares were registered
under the Securities Act, any preliminary prospectus or final prospectus
contained in the Registration Statement, or any amendment or supplement to
the Registration Statement, or arise out of or are based upon any omission
or alleged omission to state a material fact required to be stated therein
or necessary to make the statements therein not misleading, if and to the
extent that the statement or omission was made in reliance upon and in
conformity with information relating to such Selling Stockholder furnished
in writing to Aspen by or on behalf of such Selling Stockholder
specifically for use in connection with the preparation of such
Registration Statement, prospectus, amendment or supplement; PROVIDED,
HOWEVER, that the obligations of a Selling Stockholder hereunder shall be
limited to an amount equal to the net proceeds to such Selling Stockholder
of Registrable Shares sold in connection with such registration.

     (c) INDEMNIFICATION PROCEDURES. Each party entitled to indemnification
under this Section (the "Indemnified Party") shall give notice to the party
required to provide indemnification (the "Indemnifying Party") promptly
after such Indemnified Party has actual knowledge of any claim as to which
indemnity may be sought, and shall permit the Indemnifying Party to assume
the defense of any such claim or any litigation resulting therefrom;
PROVIDED, that counsel for the Indemnifying Party, who shall conduct the
defense of such claim or litigation, shall be approved by the Indemnified
Party (whose approval shall not be unreasonably withheld); and, PROVIDED,
FURTHER, that the failure of any Indemnified Party to give notice as
provided herein shall not relieve the Indemnifying Party of its obligations
under this Section except to the extent that the Indemnifying Party is
adversely affected by such failure. The Indemnified Party may participate
in such defense at such party's expense; PROVIDED that the Indemnifying
Party shall pay such expense if representation of such Indemnified Party by
the counsel retained by the Indemnifying Party is determined to be
inappropriate, based upon the advice of counsel, for the Indemnified Party
due to actual or potential differing interests between the Indemnified
Party and any other party represented by such counsel in such proceeding;
PROVIDED, FURTHER, that in no event shall the Indemnifying Party be
required to pay the expenses of more than one law firm per jurisdiction as
counsel for the Indemnified Party. The Indemnifying Party also shall be
responsible for the expenses of such defense if the Indemnifying Party does
not elect to assume such defense. No Indemnifying Party, in the defense of
any such claim or litigation shall, except with the consent of each
Indemnified Party, consent to entry of any judgment or enter into any
settlement that does not include as an unconditional term thereof the
giving by the claimant or plaintiff to such Indemnified Party of a release
from all liability in respect of such claim or litigation, and no
Indemnified Party shall consent to entry of any judgment or settle such
claim or litigation without the prior written consent of the Indemnifying
Party, which consent shall not be unreasonably withheld.

     (d) CONTRIBUTION. In order to provide for just and equitable
contribution in circumstances in which the indemnification provided for in
this Section 2.5 is due in accordance with its terms but for any reason is
held to be unavailable to an Indemnified Party in respect to any losses,
claims, damages and liabilities referred to herein, then the Indemnifying
Party shall, in lieu of indemnifying such Indemnified Party, contribute to
the amount paid or payable by such Indemnified Party as a result of such
losses, claims, damages or liabilities to which such party may be subject
in such proportion as is appropriate to reflect the relative fault of Aspen
on the one hand and the Selling Stockholders on the other in connection
with the statements or omissions that resulted in such losses, claims,
damages or

liabilities, as well as any other relevant equitable considerations. The relative fault of Aspen and the Selling Stockholders shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of material fact related to information supplied (or required to be supplied) by Aspen or the Selling Stockholders and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. Aspen and the Selling Stockholders agree that it would not be just and equitable if contribution pursuant to this Section 2.5 were determined by pro rata allocation or by any other method of allocation that does not take account of the equitable considerations referred to above. Notwithstanding the provisions of this paragraph of Section 2.5, (a) in no case shall any one Selling Stockholder be liable or responsible for any amount in excess of the net proceeds received by such Selling Stockholder from the offering of Registrable Shares and (b) Aspen shall be liable and responsible for any amount in excess of such proceeds; PROVIDED that no person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. Any party entitled to contribution will, promptly after receipt of notice of commencement of any action, suit or proceeding against such party in respect of which a claim for contribution may be made against another party or parties under this Section, notify such party or parties from whom contribution may be sought, but the omission so to notify such party or parties from whom contribution may be sought shall not relieve such party from any other obligation it or they may have thereunder or otherwise under this Section. No party shall be liable for contribution with respect to any action, suit, proceeding or claim settled without its prior written consent, which consent shall not be unreasonably withheld.

2.6.    OTHER MATTERS WITH RESPECT TO UNDERWRITTEN OFFERINGS. In the event that Registrable Shares are sold pursuant to a Registration Statement in an underwritten offering pursuant to Section 2.1, Aspen agrees to: (a) enter into an underwriting agreement containing customary representations and warranties with respect to the business and operations of Aspen and customary covenants and agreements to be performed by Aspen, including without limitation customary provisions with respect to indemnification by Aspen of the underwriters of such offering; (b) use its best efforts to cause its legal counsel to render customary opinions to the underwriters with respect to the Registration Statement; and (c) use its best efforts to cause its independent public accounting firm to issue a customary "cold comfort letter" to the underwriters with respect to the Registration Statement.

2.7.    INFORMATION BY HOLDER. Each Stockholder included in any registration shall furnish to Aspen such information regarding such Stockholder and the distribution proposed by such Stockholder as Aspen may reasonably request in writing and as shall be required in connection with any registration, qualification or compliance referred to in this Agreement.

2.8.    "STAND-OFF" AGREEMENT; CONFIDENTIALITY OF NOTICES. Each Stockholder, if requested by Aspen and the managing underwriters of an underwritten public offering by Aspen of Aspen Common, shall not sell or otherwise transfer or dispose of any Registrable Shares or other securities of Aspen, other than Registrable Shares covered by the Initial Registration, for the applicable lock-up period under lock-up arrangements generally entered into by selling stockholders, executive officers and directors of Aspen at the request of such managing underwriters, PROVIDED that such period shall not extend beyond 180 days after the date of the final prospectus for such offering. Aspen may impose stop-transfer instructions with respect to the Registrable Shares or other securities subject to the foregoing restriction until the end of such 180-day period. Any Stockholder receiving any written notice from Aspen regarding Aspen's plans to file a Registration Statement shall treat such notice confidentially and shall not disclose such information to any person other than as necessary to exercise his rights under this Agreement.

2.9.    RULE 144 REQUIREMENTS. Aspen agrees to:

(a) make and keep current public information about Aspen available, as those terms are understood and defined in Rule 144;

(b) use its best efforts to prepare and file with the Commission in a timely manner all reports and other documents required of Aspen under the Securities Act and the Exchange Act (at any time after it has become subject to such reporting requirements); and

(c) promptly furnish to any holder of Registrable Shares upon request (i) a written statement by Aspen as to its compliance with the reporting requirements of Rule 144 and of the Securities Act and the Exchange Act (at any time after it has become subject to such reporting requirements), (ii) a copy of the most recent annual or quarterly report of Aspen, and (iii) such other reports and documents of Aspen as such holder may reasonably request to avail itself of any similar rule or regulation of the Commission allowing it to sell any such securities without registration.

2.10.  SECTIONS 2.1 AND 2.2 TERMINATION. All of Aspen's obligations to register Registrable Shares of any Stockholder under Sections 2.1 and 2.2 shall terminate on the earlier of (a) the second anniversary of the date of this Agreement and (b) the first date on which all of the Registrable Shares of such Stockholder may be sold within a three-month period pursuant to Rule 144.

3.  TRANSFERS OF RIGHTS

This Agreement, and the rights and obligations of each Stockholder hereunder, may be assigned by such Stockholder (a) to any person or entity to which at least 25,000 Shares are transferred by such Stockholder, (b) without consideration to any partner, limited liability company member or stockholder of such Stockholder or to the estate or a controlled affiliate of such partner, limited liability company member or stockholder, or (c) by gift, will or intestate succession to any family member of such Stockholder or any trust or other entity for the benefit of such family member, and such assignee thereafter shall be deemed a "Stockholder" for purposes of this Agreement; PROVIDED that the assignee provides written notice of such assignment to Aspen and agrees in writing to be bound hereby.

4.  GENERAL

4.1.  AMENDMENTS AND WAIVERS. Any term of this Agreement may be amended or terminated and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), with the written consent of Aspen and the holders of at least a majority of the Registrable Shares held by all of the Stockholders. Any such amendment, termination or waiver effected in accordance with this Section 4.1 shall be binding on all parties hereto, even if they do not execute such consent. No waiver by any party hereto with respect to any condition or breach hereunder shall be deemed to extend to any prior or subsequent condition or breach hereunder or affect in any way any rights arising by virtue of any prior or subsequent condition or breach. No failure on the part of any parties hereto to exercise, and no delay in exercising any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.

4.2.  CONSTRUCTION.

(a) The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

-9-

(b) The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction shall be applied against a party hereto.

(c) The term "including" as used herein shall not be construed so as to exclude any other thing not referred to or described.

(d) References herein to "Sections" shall be deemed to be to sections of this Agreement, unless otherwise specified.

4.3. ENTIRE AGREEMENT; SUCCESSORS. This Agreement (a) constitutes the entire agreement, and supersedes all other prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof, and (b) is not intended to confer upon any person other than the parties hereto any rights or remedies hereunder, except as otherwise expressly provided herein. Subject to the preceding sentence, this Agreement shall be binding upon and inure to the benefit of the parties named herein and their respective successors and permitted assigns.

4.4. GOVERNING LAW. This Agreement shall be governed by and construed in accordance with the internal laws of the Commonwealth of Massachusetts without giving effect to any choice or conflict of law provision or rule (whether of the Commonwealth of Massachusetts or any other jurisdiction) that would cause the application of laws of any jurisdictions other than those of the Commonwealth of Massachusetts. THE PARTIES HERETO WAIVE ANY RIGHT THEY MAY HAVE, AND AGREE NOT TO DEMAND, A TRIAL BY JURY.

4.5. NOTICES. All notices, instructions, demands, claims, requests and other communications given hereunder or in connection herewith shall be in writing. Any such communication shall be sent either (a) by registered or certified mail, return receipt requested, postage prepaid, or (b) via a reputable nationwide overnight courier service, in each case to the address set forth below. Any such communication shall be deemed to have been delivered two business days after it is sent by registered or certified mail, return receipt requested, postage prepaid, or one business day after it is sent via a reputable nationwide overnight courier service.

|  |  |
|---|---|
| To Aspen: | Aspen Technology, Inc.<br>Ten Canal Park Cambridge, Massachusetts 02141<br>Facsimile:  617.577.0722<br>Attention:  Chief Executive Officer |
| WITH A COPY TO: | Hale and Dorr LLP<br>60 State Street<br>Boston, Massachusetts  02109<br>Facsimile:  617.526.5000<br>Attention:  Mark L. Johnson |
| To any Stockholder: | At such Stockholder's address of record in the stock transfer records of Aspen |
| WITH COPIES TO: | Sher Garner Cahill Richter Klein<br>McAlister & Hilbert, L.L.C.<br>909 Poydras Street, 28th Floor<br>New Orleans, Louisiana  70112<br>Facsimile:  504.299.2300<br>Attention:  Steven I. Klein |

WITH COPIES TO (WITH RESPECT TO THOSE
NOTICES TO JAMES B. BASSICH, MICHAEL S.
BENBOW, KENNETH P. CALLAWAY, MARCUS M.
CHEVIS, ROBERT W. PHILLPOTT,
PONTCHARTRAIN TECHNOLOGY, INC., AND
CLAYTON J. WHITE):

> Carver, Darden, Koretzky, Tessier,
> Finn, Blossman & Areaux, L.L.C.
> 1100 Poydras Street, Suite 2700
> New Orleans, Louisiana  70163
> Facsimile:  504.585.3810
> Attention:  Raymond G. Areaux

Any party hereto may give any notice, instruction, demand, claim, request or
other communication hereunder using any other means (including personal
delivery, expedited courier, messenger service, telecopy, telex, ordinary mail
or electronic mail), but no such communication shall be deemed to have been duly
given unless and until it actually is received by the party for which it is
intended. Any party hereto may change the address to which notices,
instructions, demands, claims, requests and other communications hereunder are
to be delivered by giving the other parties hereto notice in the manner set
forth in this Section 4.5.

4.6.  SEVERABILITY. Any term or provision of this Agreement that is invalid
or unenforceable in any circumstances in any jurisdiction shall not affect the
validity or enforceability of the remaining terms and provisions hereof or the
validity or enforceability of the offending term or provision in any other
circumstances or in any other jurisdiction. If the final judgment of a court of
competent jurisdiction declares that any term or provision hereof is invalid or
unenforceable, the parties hereto agree that the court making the determination
of invalidity or unenforceability shall have the power to limit the term or
provision, to delete specific words or phrases, or to replace any invalid or
unenforceable term or provision with a term or provision that is valid and
enforceable and that comes closest to expressing the intention of the invalid or
unenforceable term or provision, and this Agreement shall be enforceable as so
modified.

4.7. SIGNATURES. This Agreement may be executed in counterparts, each of
which shall be deemed an original but all of which together shall constitute one
and the same instrument. This Agreement may be executed by facsimile signature.

* * *

-11-

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above.

ASPEN TECHNOLOGY, INC.

By /s/ Mary A. Palermo
------------------------------------------
   Title: Mary A. Palermo

STOCKHOLDERS:

ADVANTAGE CAPITAL PARTNERS VI, LIMITED

By:  Advantage Capital NOLA VI, L.L.C.,
     as General Partner

     By: /s/ Steven Stull
     ------------------------------------------
         Steven Stull, Managing Member

ADVANTAGE CAPITAL PARTNERS VII, LIMITED

By:  Advantage Capital NOLA VII, L.L.C.,
     as General Partner

     By: /s/ Steven Stull
     ------------------------------------------
         Steven Stull, Managing Member

ADVANTAGE CAPITAL PARTNERS VIII, LIMITED

By:  Advantage Capital NOLA VIII, L.L.C.,
     as General Partner

     By: /s/ Steven Stull
     ------------------------------------------
         Steven Stull, Managing Member

ADVANTAGE CAPITAL PARTNERS X, LIMITED

By: Advantage Capital NOLA X, L.L.C.,
    as General Partner

    By: /s/ Steven Stull
    ------------------------------------------
        Steven Stull, Managing Member

/s/ James B. Bassich
------------------------------------------
JAMES B. BASSICH

/s/ Michael S. Benbow
------------------------------------------
MICHAEL S. BENBOW

/s/ Kenneth P. Callaway
------------------------------------------
KENNETH P. CALLAWAY

-12-

```
/s/ Marcus M. Chevis
-------------------------------------------
MARCUS M. CHEVIS

COMPUTERIZED PROCESSES UNLIMITED, L.L.C.


By: /s/ Marcus M. Chevis
    -------------------------------------------
    Marcus M. Chevis, President

P/V SOFTWARE, L.L.C.


By: /s/ David J. Erath
    -------------------------------------------
    Name: David J. Erath, Authorized
          Representative

/s/ Robert W. Phillpott
-------------------------------------------
ROBERT W. PHILLPOTT

PONTCHARTRAIN TECHNOLOGY, INC.


By: /s/ Marcus M. Chevis
    -------------------------------------------
    Name: Marcus M. Chevis

/s/ Clayton J. White
-------------------------------------------
CLAYTON J. WHITE
```

-13-

SCHEDULE I

| NAME | NUMBER OF SHARES OF ASPEN COMMO |
|------|--------------------------------|
| Advantage Capital Partners VI, Limited<br>LL&E Tower, Suite 2230<br>909 Poydras Street<br>New Orleans, Louisiana  70112 | 44,467 |
| Advantage Capital Partners VII, Limited<br>LL&E Tower, Suite 2230<br>909 Poydras Street<br>New Orleans, Louisiana  70112 | 32,447 |
| Advantage Capital Partners VIII, Limited<br>LL&E Tower, Suite 2230<br>909 Poydras Street<br>New Orleans, Louisiana  70112 | 11,054 |
| Advantage Capital Partners X, Limited<br>LL&E Tower, Suite 2230<br>909 Poydras Street<br>New Orleans, Louisiana  70112 | 8,658 |
| James B. Bassich<br>3004 Coliseum Street<br>New Orleans, Louisiana  70115 | 29,158 |
| Michael S. Benbow<br>7300 Lakeshore Drive #38<br>New Orleans, Louisiana  70124 | 29,158 |
| Kenneth P. Callaway<br>4609 Dreyfous Avenue<br>Metairie, Louisiana  70006 | 29,158 |
| Marcus M. Chevis<br>4421 Burke Drive<br>Metairie, Louisiana  70003 | 14,579 |
| Computerized Processes Unlimited, L.L.C.<br>4200 S. I-10 Service Road S., Suite 205<br>Metairie, Louisiana  70001 | 27,081 |
| F/V Software, L.L.C.<br>650 Poydras Street, Suite 2710<br>New Orleans, Louisiana  70130 | 96,629 |
| Robert W. Phillpott<br>1007 Division Street<br>Metairie, Louisiana  70001 | 29,158 |

| NAME | NUMBER OF SHARES OF ASPEN COMMO |
|------|----------------------------------|
| ---- | -------------------------------- |

Pontchartrain Technology, Inc.
4200 S. I-10 Service Road S., Suite 205
Metairie, Louisiana  70001                                    2,338

Clayton J. White
3810 S. Post Oak Avenue
New Orleans, Louisiana  70131                                14,579

# EXHIBIT B





FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2004 AUG 31 PM 3: 48

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **F/V SOFTWARE, L.L.C.** | **CIVIL ACTION NO.** |
| **VERSUS** | **SECTION** 04-2485 |
| **ASPEN TECHNOLOGY, INC.** | **HON.** _____ No. 5 |
| | **MAGISTRATE JUDGE:** B |
| | **HON.** _____, M.J. 2 |

## COMPLAINT FOR BREACH OF CONTRACT

NOW INTO COURT, through undersigned counsel, comes plaintiff F/V Software, L.L.C., and for this its complaint for breach of contract, represents:

### PARTIES

1.     Plaintiff F/V Software, L.L.C. is a limited liability corporation organized under the laws of the state of Louisiana with its principal place of business in New Orleans, Louisiana.

2.     Defendant Aspen Technology, Inc. ("Aspen") is a corporation organized under the laws of the State of Delaware with its principal place of business in Cambridge, Massachusetts.

### JURISDICTION

3.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332.  Diversity of citizenship exists between the parties, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

_____ Fee 150.00
_____ Process _____
__X__ Dktd _____
_____ CtRmDep_____
_____ Doc. No. 1

## PRE-CONTRACT NEGOTIATIONS

4.    Plaintiff was part owner of a Louisiana company called Computerized Processes Unlimited, Inc. ("CPU") that developed a business unit (the "PAI business") that CPU desired to liquidate.

5.    Defendant Aspen entered into negotiations with CPU to acquire the PAI business, and representatives of Aspen and CPU met on May 4, 2001 in Houston, Texas and on May 16, 2001 in Metairie, Louisiana.

6.    During the negotiations, CPU's representatives expressed a desire to receive cash for the liquidation of the PAI business it would sell to defendant, but defendant expressed a willingness to tender only shares of its common stock.

7.    During negotiations, representatives of defendant stated that as part of its acquisition of the PAI business, it would issue shares of defendant's stock directly to the owners of CPU, including plaintiff, and defendant would undertake to register their shares with the Securities and Exchange Commission ("SEC") simultaneously with its acquisition of the PAI business.

8.    During negotiations, representatives of defendant further stated that its affairs with the SEC were in good order such that the parties could reasonably expect that the SEC would approve the registration of shares to be issued to plaintiff (and others) in time close in proximity to the acquisition of the PAI business by defendant, or within approximately two weeks after the closing of the transaction.

2

9.     On May 16, 2001, defendant and CPU reached an agreement in principle for the

sale of the PAI business to defendant for $11.3 million in unregistered shares to be issued to the

owners of CPU, including plaintiff, with Aspen promising to register the stock with the SEC so

that plaintiff (and others) could liquidate and receive cash for their investment in the PAI

business.

THE CONTRACT

10.     On June 15, 2001, in connection with the sale of the PAI business by CPU to

defendant, plaintiff (and others) entered into a contract with defendant, denominated the

Registration Rights Agreement ("RRA"), a copy of which is attached hereto as Exhibit A.

11.     Pursuant to the RRA, on June 15, 2001 defendant issued 96,629 shares of its stock

to plaintiff.

12.     Pursuant to the RRA, Aspen promised to file on June 15, 2001, a shelf registration

statement on Form S-3 to register the shares of stock issued to plaintiff in connection with the

sale of the PAI business.

13.     Pursuant to the RRA, defendant represented and warranted to plaintiff that as of

June 15, 2001, there were no facts that would form the basis of a good faith determination to

delay filing the initial registration.

14.     Pursuant to the RRA, defendant promised to prepare and file with the SEC a

registration statement on an appropriate form as expeditiously as possible and cause such

registration statement to be declared effective by the SEC at the earliest practicable date.

## DEFENDANT'S BREACH OF CONTRACT

15.     On June 15, 2001, as was known to defendant, the SEC had under review prior filings of defendant, including forms 10-Q and 10-K such that defendant's registration of plaintiff's shares pursuant to the RRA could not be done.

16.     On June 15, 2001, as was known or should have been known to defendant, defendant had not filed a proxy statement required for Form 10-K for the year ending June 30, 2000, such that defendant was not eligible to register plaintiff's shares on SEC Form S-3 as required by the RRA.

17.     On June 15, 2001, defendant filed a Form S-3 with the SEC to register plaintiff's shares, but that filing was defective and later withdrawn.

18.     At least as early as August 15, 2001, defendant unilaterally and without authority ceased all effort to register plaintiff's shares.

19.     On November 16, 2001, defendant advised the SEC that it was not eligible to file a Form S-3 on June 15, 2001 and requested permission to withdraw its defective registration statement.

20.     On November 26, 2001, defendant filed a new Form S-3 with the SEC to register the shares it had issued to plaintiff on June 15, 2001.

## DAMAGES

21.     On December 14, 2001, the SEC informed defendant that it had acted to permit the registration of plaintiff's shares to become effective pursuant to the November 26, 2001 Form S-3.

4

22.    Plaintiff immediately undertook to sell its shares but received considerably less than it would have had defendant performed its obligations under the RRA. Plaintiff estimates its damages to exceed $900,000.00.

23.    Pursuant to applicable statutory provisions, plaintiff is entitled to pre-judgment interest from June 15, 2001 to the date of judgment, and legal interest thereafter.

WHEREFORE, plaintiff F/V Software, L.L.C., prays for judgment in its favor and against defendant Aspen Technology, Inc. in an amount to be determined by the Court plus pre-judgment interest from June 15, 2001, to the date of judgment, and legal interest thereafter, and for all costs of these proceedings.

Respectfully submitted,
Taggart, Morton, Ogden, Staub,
Rougelot & O'Brien, LLC

By:  _____
Eugene G. Taggart, Bar No. 12627
Terrence G. O'Brien, Bar No. 10147
1100 Poydras Street, Suite 2100
New Orleans, LA 70163-2100
Telephone: (504) 599-8500
Facsimile: (504) 599-8501

ATTORNEYS FOR F/V SOFTWARE, L.L.C.

5

# EXHIBIT A

```
<DOCUMENT>
<TYPE>EX-99.1
<SEQUENCE>4
<FILENAME>b39725atex99-1.txt
<DESCRIPTION>REGISTRATION RIGHT AGREEMENT DATED JUNE 15TH 2001
<TEXT>
<PAGE>    1
```

EXHIBIT 99.1

### REGISTRATION RIGHTS AGREEMENT

THIS REGISTRATION RIGHTS AGREEMENT dated as of June 15, 2001 is entered into between Aspen Technology, Inc., a Delaware corporation ("Aspen"), and the several persons and entities identified as "Stockholders" on the signature pages hereto (collectively, the "Stockholders").

### PRELIMINARY STATEMENT

A. This Agreement is being entered into in connection with the Membership Interest Purchase Agreement dated as of the date hereof (the "Purchase Agreement") among Aspen, Coppermine LLC ("Coppermine") and Computerized Processes Unlimited, L.L.C. ("CPU").

B. Pursuant to the Purchase Agreement, among other things, (1) Aspen is purchasing CPU's entire membership interest in Coppermine and, in consideration therefor, is issuing shares of its common stock to the designees of CPU, and (2) Aspen is agreeing to provide for certain arrangements with respect to the registration of those shares under the Securities Act of 1933.

C. The parties hereto desire to establish the terms and conditions pursuant to which registration will be effected.

NOW, THEREFORE, in consideration of the premises herein contained, the parties hereby agree as follows:

1.  CERTAIN DEFINITIONS

As used in this Agreement, the following terms shall have the following respective meanings:

"ASPEN COMMON" means the common stock, $.10 par value per share, of Aspen.

"BUSINESS DAY" means any day that the Securities and Exchange Commission is open and conducting business.

"COMMISSION" means the Securities and Exchange Commission, or any other federal agency at the time administering the Securities Act.

"EMPLOYEE STOCKHOLDERS" means Marcus Chevis and Clayton J. White.

"EXCHANGE ACT" means the Securities Exchange Act of 1934, as amended, or any successor federal statute, and the rules and regulations of the Commission issued under such Act, as they each may, from time to time, be in effect.

"PROSPECTUS" means the prospectus included in any Registration Statement, as amended or supplemented by an amendment or prospectus supplement, including post-effective amendments, and all material incorporated by reference or deemed to be incorporated by reference in such Prospectus.

"REGISTRATION STATEMENT" means a registration statement filed by Aspen with the Commission for a public offering and sale of securities of Aspen (other than a registration statement on Form S-8 or Form S-4, or their successors, or any other form for a similar limited purpose, or any registration statement covering only securities proposed to be issued in exchange for securities or assets of another corporation).

"REGISTRATION EXPENSES" means the expenses described in Section 2.4.

"REGISTRABLE SHARES" means, with respect to a Stockholder, (a) the number of shares of Aspen Common issued to such Stockholder pursuant to the Purchase Agreement and set forth opposite such Stockholder's name in Schedule I hereto (including shares initially deposited in escrow pursuant to the terms of the Purchase Agreement and subsequently delivered to such Stockholder), (b) any other securities issued by Aspen in exchange for any of such shares of Aspen Common (but, with respect to any particular Registrable Share, only so long as it continues to be a Registrable Share) and (c) any shares of Aspen Common issued as a dividend or distribution on account of Registrable Shares or resulting from a subdivision of outstanding Registrable Shares into a greater number of shares (by reclassification, stock split or otherwise); PROVIDED that a security that was at one time a Registrable Share shall cease to be a Registrable Share when (i) it has been effectively registered and sold pursuant to a Registration Statement or (ii) it has been transferred and is no longer held of record by a Stockholder.

"SECURITIES ACT" means the Securities Act of 1933, as amended, or any successor federal statute, and the rules and regulations of the Commission issued under such Act, as they each may, from time to time, be in effect.

"SELLING STOCKHOLDER" means any Stockholder owning Registrable Shares included in a Registration Statement.

"STOCKHOLDERS" means the Stockholders and any other persons or entities constituting Stockholders pursuant to Section 3.

2.  REGISTRATION RIGHTS

    2.1.  INITIAL REGISTRATION

        (a) TIMING OF INITIAL REGISTRATION. Subject to Section 2.1(b), Aspen shall file, by June 15, 2001, a shelf Registration Statement on Form S-3 (the "Initial Registration") to register 368,461 of the shares of Aspen Common issued to the Stockholders pursuant to the Purchase Agreement, which shares shall be registered for offering by the Stockholders in the respective numbers set forth in Schedule I hereto. Thereupon, Aspen shall comply with the registration procedures of Section 2.3 with respect to the Initial Registration.

        (b) DEFERRAL OF INITIAL REGISTRATION. If at the time of the Initial Registration pursuant to Section 2.1(a),

                (i)  Aspen is engaged (or Aspen's Board of Directors has determined in good faith to engage within 90 days of the time of the Initial Registration) in a registered public offering of securities for its own account or any other activity that, in the good faith determination of Aspen's Board of Directors, would be adversely affected by the Initial Registration, and

                (ii) Aspen's Board of Directors determines in good faith, by appropriate resolutions, that, as a result of such offering or other activity, (A) it would be detrimental to Aspen (other than as relating solely to the price of the Aspen Common) to file the Initial Registration at such time and (B) it is in the best interests of Aspen to defer proceeding with the Initial Registration at such time,

then Aspen may direct that the filing of the Initial Registration be delayed for a period not to exceed (x) 120 days from the date on which Aspen provides such direction or (y) the period during which (in the good faith determination of Aspen's Board of Directors) filing the Initial Registration would be detrimental to Aspen, whichever occurs first. This right to delay filing the Initial Registration may

-2-

not be exercised by Aspen more than once. Aspen represents and warrants to the Stockholders that, as of the date hereof, there are no facts that would form the basis of a good faith determination by the Board of Directors pursuant to this Section 2.1(b) to delay filing the Initial Registration.

(c) SUSPENSION OF INITIAL REGISTRATION. Aspen shall maintain the effectiveness of the Initial Registration for a period of 90 days after it has been first declared effective by the Commission, PROVIDED that if, as of the final date of such 90-day period, any other secondary shelf Registration Statement on Form S-3 of Aspen is effective, Aspen shall continue to maintain the effectiveness of the Initial Registration until such date as of which no other such secondary shelf Registration Statement is in effect. Notwithstanding the foregoing, Aspen may, by written notice to the Stockholders, suspend or withdraw any such Registration Statement and require that the Stockholders immediately cease the sale of shares of Aspen pursuant thereto if:

>  (i) Aspen is engaged in any activity or transaction or preparations or negotiations for any activity or transaction that Aspen desires to keep confidential for business reasons, and Aspen's Board of Directors determines in good faith, by appropriate resolutions, that the public disclosure requirements imposed on Aspen pursuant to such Registration Statement would require disclosure of such activity or transaction;

>  (ii) Aspen files a Registration Statement with the Commission for the purpose of registering under the Securities Act, any securities to be publicly offered and sold by Aspen; or

>  (iii) Aspen fails to satisfy the requirements for use of Form S-3, as set forth in the general instructions to Form S-3.

Upon receipt of such notice, each Stockholder shall immediately discontinue any sales of Registrable Shares pursuant to the Initial Registration until such Stockholder has received copies of a supplemented or amended Prospectus or until such Stockholder may be advised in writing by Aspen that the then-current Prospectus may be used and has received copies of any additional or supplemental filings that are incorporated or deemed incorporated by reference in such Prospectus.

(d) SALES THROUGH MARKET MAKERS. The Stockholders agree that, during the first ten trading days after the effective date of the Initial Registration, any trades of Registrable Shares under the Initial Registration shall be effected through First Union Securities, Inc. as broker, which shall work with Herzog, Heine & Geduld Inc. to sell such Registrable Shares in accordance with reasonable pricing parameters set forth by Stockholders based on then-current market conditions. Notwithstanding the foregoing, if any of such Registrable Shares are not sold within such ten trading days, the Stockholders may, elect to effect trades of those remaining shares through Merrill Lynch or, with the consent of Aspen (which consent shall not be unreasonably withheld), through a different brokerage firm that serves as a market maker for Aspen Common.

2.2. PIGGYBACK REGISTRATION

(a) REQUEST FOR INCLUSION AND BEST EFFORTS. If Aspen determines to file a Registration Statement for an underwritten public offering (a "Piggyback Registration"), then Aspen shall promptly, prior to such filing, provide written notice to all Stockholders of its intention to do so, PROVIDED that no such notice is required to be given if no Registrable Shares are to be included therein as a result of a determination of the managing underwriter pursuant to Section 2.2(b). Upon the written request of a Stockholder or Stockholders given within 20 days after Aspen provides such notice (which request shall state the intended method of disposition of such Registrable Shares), Aspen shall use its best efforts to cause all Registrable Shares that Aspen has been requested by such Stockholder or

-3-

Stockholders to register to be registered under the Securities Act to the extent necessary to permit their sale or other disposition in accordance with the intended methods of distribution specified in the request of such Stockholder or Stockholders, PROVIDED that Aspen shall have the right to postpone or withdraw any registration effected pursuant to this Section 2.2 without obligation to any Stockholder.

(b) UNDERWRITING. The right of any Stockholder to include its Registrable Shares in such registration pursuant to Section 2.2 shall be conditioned upon such Stockholder's participation in the contemplated underwritten public offering on the terms set forth in this Agreement. All Stockholders proposing to distribute their securities through such underwriting shall enter into an underwriting agreement in customary form with the underwriter or underwriters selected for the underwriting by Aspen. Notwithstanding any other provision of this Section 2.2, if the managing underwriters determine that the inclusion of all shares requested to be registered would adversely affect the offering, then Aspen may limit the number of Registrable Shares to be included in the Piggyback Registration and shall so advise all holders of Registrable Shares requesting registration. The number of shares that are entitled to be included in the registration and underwriting shall be allocated in the following manner:

(i) The securities of Aspen held by holders other than Stockholders and other holders of securities of Aspen who are entitled, by contract with Aspen, to have their securities included in such registration (each an "Other Holder") shall be excluded from such Piggyback Registration to the extent deemed advisable by the managing underwriters, and, if a further limitation on the number of shares is required, then the number of shares that may be included in such Piggyback Registration shall be allocated PRO RATA (on an as-converted basis) among all Stockholders and Other Holders requesting registration in accordance with the respective number of shares of Aspen Common held when Aspen provides notice as specified in Section 2.2(a).

(ii) If any Stockholder or Other Holder is entitled to include more securities than such Stockholder or Other Holder requested to be registered, then the excess securities shall be allocated among other requesting Stockholders and Other Holders pro rata in the manner described in the preceding clause (i).

If any holder of Registrable Shares or Other Holder disapproves of the terms of any such underwriting, such person may elect to withdraw therefrom by written notice to Aspen, and any Registrable Shares or other securities excluded or withdrawn from such underwriting shall be withdrawn from such registration.

2.3. REGISTRATION PROCEDURES

(a) GENERAL. If and whenever Aspen is required by the provisions of this Agreement to use its best efforts to effect the registration of any Registrable Shares under the Securities Act, Aspen shall:

(i) prepare and file with the Commission a Registration Statement (including the Initial Registration) on an appropriate form as expeditiously as possible, and cause such Registration Statement to be declared effective by the Commission at the earliest practicable date;

(ii) as expeditiously as possible prepare and file with the Commission any amendments and supplements to the Registration Statement and the Prospectus included in the Registration Statement as may be necessary to comply with the provisions of the Securities Act (including the anti-fraud provisions thereof) and to keep the Registration Statement effective for at least 90 days from the effective date (or, in the

-4-

case of the Initial Registration, for the period specified in Section 2.1(c)) or such lesser period until all such Registrable Shares are sold;

(iii) as expeditiously as possible furnish to each Selling Stockholder such reasonable numbers of copies of the Prospectus, including any preliminary Prospectus, in conformity with the requirements of the Securities Act, and such other documents as such Selling Stockholder may reasonably request in order to facilitate the public sale or other disposition of the Registrable Shares owned by such Selling Stockholder;

(iv) as expeditiously as possible use its best efforts to register or qualify the Registrable Shares covered by the Registration Statement under the securities or Blue Sky laws of such states as the Selling Stockholders shall reasonably request, and do any and all other acts and things that may be necessary or desirable to enable the Selling Stockholders to consummate the public sale or other disposition in such states of the Registrable Shares owned by the Selling Stockholder, PROVIDED that Aspen shall not be required in connection with this paragraph (iv) to qualify as a foreign corporation or execute a general consent to service of process in any jurisdiction;

(v) prior to the effective date of the Registration Statement, cause all such Registrable Shares to be listed on each securities exchange or automated or inter-dealer quotation system on which similar securities issued by Aspen are then listed;

(vi) promptly provide a transfer agent and registrar for all such Registrable Shares no later than the effective date of such Registration Statement;

(vii) promptly make available for inspection by the Selling Stockholders, any managing underwriter participating in any disposition pursuant to such Registration Statement, and any attorney or accountant or other agent retained by any such underwriter or selected by the Selling Stockholders, all financial and other records, pertinent corporate documents and properties of Aspen and cause Aspen's officers, directors, employees and independent accountants to supply all information reasonably requested by any such seller, underwriter, attorney, accountant or agent in connection with such Registration Statement;

(viii) as expeditiously as possible, notify each Selling Stockholder at any time when a Prospectus relating to the Registration Statement is required to be delivered under the Securities Act, of the happening of any event as a result of which the Prospectus included in such Registration Statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statement therein not misleading or incomplete in light of the circumstances then existing, and promptly amend the Registration Statement and/or related Prospectus to correct such untrue statement or to include the omitted information;

(ix) as expeditiously as possible, notify each Selling Stockholder, promptly after it shall receive notice thereof, of the time when such Registration Statement has become effective or a supplement to any Prospectus forming a part of such Registration Statement has been filed; and

(x) as expeditiously as possible following the effectiveness of such Registration Statement, notify each seller of such Registrable Shares of any stop order, order of

-5-

formal or informal investigation or any request by the
Commission for the amending or supplementing of such
Registration Statement or Prospectus.

(b) PROSPECTIVE AMENDMENTS. If Aspen has delivered a Prospectus to the
Selling Stockholders and after having done so the Prospectus is amended to
comply with the requirements of the Securities Act, Aspen shall, as
expeditiously as possible, notify the Selling Stockholders and, if
requested, the Selling Stockholders shall immediately cease making offers
of Registrable Shares and return all Prospectuses to Aspen. Aspen shall, as
expeditiously as possible, provide the Selling Stockholders with revised
Prospectuses and, following receipt of the revised Prospectuses, the
Selling Stockholders shall be free to resume making offers of the
Registrable Shares.

2.4. ALLOCATION OF EXPENSES. Aspen will pay all Registration Expenses for
all registrations under this Agreement. For purposes of this Section, the term
"Registration Expenses" shall mean all expenses incurred in effecting any
registration pursuant to this Agreement, including all registration and filing
fees, exchange listing fees, printing expenses, fees and expenses of counsel and
accountants for Aspen, state Blue Sky fees and expenses, and the expense of any
regular or special audits incident to or required by any such registration, but
excluding underwriting discounts, selling commissions and the fees and expenses
of Selling Stockholders' own counsel.

2.5.   INDEMNIFICATION AND CONTRIBUTION.

(a) INDEMNIFICATION BY ASPEN. In the event of any registration of any
of the Registrable Shares under the Securities Act pursuant to this
Agreement, Aspen will indemnify and hold harmless each Selling Stockholder,
each underwriter of such Registrable Shares, and each other person, if any,
who controls such Selling Stockholder or underwriter within the meaning of
the Securities Act or the Exchange Act, with respect to each registration,
qualification or compliance effected pursuant to this Section 2, against
any losses, claims, damages, liabilities (or actions, proceedings or
settlements in respect thereof), joint or several, to which such Selling
Stockholder, underwriter or controlling person may become subject under the
Securities Act, the Exchange Act, state securities or Blue Sky laws or
otherwise, insofar as such losses, claims, damages or liabilities (or
actions, proceedings or settlements in respect thereof) arise out of or are
based upon any untrue statement or alleged untrue statement of any material
fact contained in any Registration Statement under which such Registrable
Shares were registered under the Securities Act, any preliminary prospectus
or final prospectus contained in the Registration Statement, or any
amendment or supplement to such Registration Statement, incident to any
such registration, qualification or compliance, or arise out of or are
based upon the omission or alleged omission to state a material fact
required to be stated therein or necessary to make the statements therein
not misleading; or any violation by Aspen of the Securities Act or Exchange
Act or any rule or regulation thereunder applicable to Aspen and relating
to action or inaction required by Aspen in connection with any such
registration, qualification or compliance; and Aspen will reimburse such
Selling Stockholder, underwriter and each such controlling person for any
legal or any other expenses reasonably incurred by such Selling
Stockholder, underwriter or controlling person in connection with
investigating or defending any such loss, claim, damage, liability or
action; PROVIDED, HOWEVER, that Aspen will not be liable in any such case
to the extent that any such loss, claim, damage or liability arises out of
or is based upon any untrue statement or omission made in such Registration
Statement, preliminary prospectus or prospectus, or any such amendment or
supplement, in reliance upon and in conformity with written information
furnished to Aspen, by or on behalf of such Selling Stockholder,
underwriter or controlling person and stated to be specifically for use in
the preparation thereof.

(b) INDEMNIFICATION BY SELLING STOCKHOLDERS. In the event of any
registration of any of the Registrable Shares under the Securities Act
pursuant to this Agreement, each Selling Stockholder,

-6-

severally and not jointly, will indemnify and hold harmless Aspen, each of
its directors and officers and each underwriter (if any) and each person,
if any, who controls Aspen or any such underwriter within the meaning of
the Securities Act or the Exchange Act, against any losses, claims, damages
or liabilities, joint or several, to which Aspen, such directors and
officers, underwriter or controlling person may become subject under the
Securities Act, Exchange Act, state securities or Blue Sky laws or
otherwise, insofar as such losses, claims, damages or liabilities (or
actions in respect thereof) arise out of or are based·upon any untrue
statement or alleged untrue statement of a material fact contained in any
Registration Statement under which such Registrable Shares were registered
under the Securities Act, any preliminary prospectus or final prospectus
contained in the Registration Statement, or any amendment or supplement to
the Registration Statement, or arise out of or are based upon any omission
or alleged omission to state a material fact required to be stated therein
or necessary to make the statements therein not misleading, if and to the
extent that the statement or omission was made in reliance upon and in
conformity with information relating to such Selling Stockholder furnished
in writing to Aspen by or on behalf of such Selling Stockholder
specifically for use in connection with the preparation of such
Registration Statement, prospectus, amendment or supplement; PROVIDED,
HOWEVER, that the obligations of a Selling Stockholder hereunder shall be
limited to an amount equal to the net proceeds to such Selling Stockholder
of Registrable Shares sold in connection with such registration.

    (c) INDEMNIFICATION PROCEDURES. Each party entitled to indemnification
under this Section (the "Indemnified Party") shall give notice to the party
required to provide indemnification (the "Indemnifying Party") promptly
after such Indemnified Party has actual knowledge of any claim as to which
indemnity may be sought, and shall permit the Indemnifying Party to assume
the defense of any such claim or any litigation resulting therefrom;
PROVIDED, that counsel for the Indemnifying Party, who shall conduct the
defense of such claim or litigation, shall be approved by the Indemnified
Party (whose approval shall not be unreasonably withheld); and, PROVIDED,
FURTHER, that the failure of any Indemnified Party to give notice as
provided herein shall not relieve the Indemnifying Party of its obligations
under this Section except to the extent that the Indemnifying Party is
adversely affected by such failure. The Indemnified Party may participate
in such defense at such party's expense; PROVIDED that the Indemnifying
Party shall pay such expense if representation of such Indemnified Party by
the counsel retained by the Indemnifying Party is determined to be
inappropriate, based upon the advice of counsel, for the Indemnified Party
due to actual or potential differing interests between the Indemnified
Party and any other party represented by such counsel in such proceeding;
PROVIDED, FURTHER, that in no event shall the Indemnifying.Party be
required to pay the expenses of more than one law firm per jurisdiction as
counsel for the Indemnified Party. The Indemnifying Party also shall be
responsible for the expenses of such defense if the Indemnifying Party does
not elect to assume such defense. No Indemnifying Party, in the defense of
any such claim or litigation shall, except with the consent of each
Indemnified Party, consent to entry of any judgment or enter into any
settlement that does not include as an unconditional term thereof the
giving by the claimant or plaintiff to such Indemnified Party of a release
from all liability in respect of such claim or litigation, and no
Indemnified Party shall consent to entry of any judgment or settle such
claim or litigation without the prior written consent of the Indemnifying
Party, which consent shall not be unreasonably withheld.

    (d) CONTRIBUTION. In order to provide for just and equitable
contribution in circumstances in which the indemnification provided for in
this Section 2.5 is due in accordance with its terms but for any reason is
held to be unavailable to an Indemnified Party in respect to any losses,
claims, damages and liabilities referred to herein, then the Indemnifying
Party shall, in lieu of indemnifying such Indemnified Party, contribute to
the amount paid or payable by such Indemnified Party as a result of such
losses, claims, damages or liabilities to which such party may be subject
in such proportion as is appropriate to reflect the relative fault of Aspen
on the one hand and the Selling Stockholders on the other in connection
with the statements or omissions that resulted in such losses, claims,
damages or

liabilities, as well as any other relevant equitable considerations. The relative fault of Aspen and the Selling Stockholders shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of material fact related to information supplied (or required to be supplied) by Aspen or the Selling Stockholders and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. Aspen and the Selling Stockholders agree that it would not be just and equitable if contribution pursuant to this Section 2.5 were determined by pro rata allocation or by any other method of allocation that does not take account of the equitable considerations referred to above. Notwithstanding the provisions of this paragraph of Section 2.5, (a) in no case shall any one Selling Stockholder be liable or responsible for any amount in excess of the net proceeds received by such Selling Stockholder from the offering of Registrable Shares and (b) Aspen shall be liable and responsible for any amount in excess of such proceeds; PROVIDED that no person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. Any party entitled to contribution will, promptly after receipt of notice of commencement of any action, suit or proceeding against such party in respect of which a claim for contribution may be made against another party or parties under this Section, notify such party or parties from whom contribution may be sought, but the omission so to notify such party or parties from whom contribution may be sought shall not relieve such party from any other obligation it or they may have thereunder or otherwise under this Section. No party shall be liable for contribution with respect to any action, suit, proceeding or claim settled without its prior written consent, which consent shall not be unreasonably withheld.

2.6.    OTHER MATTERS WITH RESPECT TO UNDERWRITTEN OFFERINGS. In the event that Registrable Shares are sold pursuant to a Registration Statement in an underwritten offering pursuant to Section 2.1, Aspen agrees to: (a) enter into an underwriting agreement containing customary representations and warranties with respect to the business and operations of Aspen and customary covenants and agreements to be performed by Aspen, including without limitation customary provisions with respect to indemnification by Aspen of the underwriters of such offering; (b) use its best efforts to cause its legal counsel to render customary opinions to the underwriters with respect to the Registration Statement; and (c) use its best efforts to cause its independent public accounting firm to issue a customary "cold comfort letter" to the underwriters with respect to the Registration Statement.

2.7.    INFORMATION BY HOLDER. Each Stockholder included in any registration shall furnish to Aspen such information regarding such Stockholder and the distribution proposed by such Stockholder as Aspen may reasonably request in writing and as shall be required in connection with any registration, qualification or compliance referred to in this Agreement.

2.8.    "STAND-OFF" AGREEMENT; CONFIDENTIALITY OF NOTICES. Each Stockholder, if requested by Aspen and the managing underwriters of an underwritten public offering by Aspen of Aspen Common, shall not sell or otherwise transfer or dispose of any Registrable Shares or other securities of Aspen, other than Registrable Shares covered by the Initial Registration, for the applicable lock-up period under lock-up arrangements generally entered into by selling stockholders, executive officers and directors of Aspen at the request of such managing underwriters, PROVIDED that such period shall not extend beyond 180 days after the date of the final prospectus for such offering. Aspen may impose stop-transfer instructions with respect to the Registrable Shares or other securities subject to the foregoing restriction until the end of such 180-day period. Any Stockholder receiving any written notice from Aspen regarding Aspen's plans to file a Registration Statement shall treat such notice confidentially and shall not disclose such information to any person other than as necessary to exercise his rights under this Agreement.

2.9.    RULE 144 REQUIREMENTS. Aspen agrees to:

-8-

    (a) make and keep current public information about Aspen available, as those terms are understood and defined in Rule 144;

    (b) use its best efforts to prepare and file with the Commission in a timely manner all reports and other documents required of Aspen under the Securities Act and the Exchange Act (at any time after it has become subject to such reporting requirements); and

    (c) promptly furnish to any holder of Registrable Shares upon request (i) a written statement by Aspen as to its compliance with the reporting requirements of Rule 144 and of the Securities Act and the Exchange Act (at any time after it has become subject to such reporting requirements), (ii) a copy of the most recent annual or quarterly report of Aspen, and (iii) such other reports and documents of Aspen as such holder may reasonably request to avail itself of any similar rule or regulation of the Commission allowing it to sell any such securities without registration.

    2.10.  SECTIONS 2.1 AND 2.2 TERMINATION. All of Aspen's obligations to register Registrable Shares of any Stockholder under Sections 2.1 and 2.2 shall terminate on the earlier of (a) the second anniversary of the date of this Agreement and (b) the first date on which all of the Registrable Shares of such Stockholder may be sold within a three-month period pursuant to Rule 144.

3.  TRANSFERS OF RIGHTS

    This Agreement, and the rights and obligations of each Stockholder hereunder, may be assigned by such Stockholder (a) to any person or entity to which at least 25,000 Shares are transferred by such Stockholder, (b) without consideration to any partner, limited liability company member or stockholder of such Stockholder or to the estate or a controlled affiliate of such partner, limited liability company member or stockholder, or (c) by gift, will or intestate succession to any family member of such Stockholder or any trust or other entity for the benefit of such family member, and such assignee thereafter shall be deemed a "Stockholder" for purposes of this Agreement; PROVIDED that the assignee provides written notice of such assignment to Aspen and agrees in writing to be bound hereby.

4.  GENERAL

    4.1.  AMENDMENTS AND WAIVERS. Any term of this Agreement may be amended or terminated and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), with the written consent of Aspen and the holders of at least a majority of the Registrable Shares held by all of the Stockholders. Any such amendment, termination or waiver effected in accordance with this Section 4.1 shall be binding on all parties hereto, even if they do not execute such consent. No waiver by any party hereto with respect to any condition or breach hereunder shall be deemed to extend to any prior or subsequent condition or breach hereunder or affect in any way any rights arising by virtue of any prior or subsequent condition or breach. No failure on the part of any parties hereto to exercise, and no delay in exercising any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.

    4.2.  CONSTRUCTION.

      (a) The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

(b) The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction shall be applied against a party hereto.

(c) The term "including" as used herein shall not be construed so as to exclude any other thing not referred to or described.

(d) References herein to "Sections" shall be deemed to be to sections of this Agreement, unless otherwise specified.

4.3. ENTIRE AGREEMENT; SUCCESSORS. This Agreement (a) constitutes the entire agreement, and supersedes all other prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof, and (b) is not intended to confer upon any person other than the parties hereto any rights or remedies hereunder, except as otherwise expressly provided herein. Subject to the preceding sentence, this Agreement shall be binding upon and inure to the benefit of the parties named herein and their respective successors and permitted assigns.

4.4. GOVERNING LAW. This Agreement shall be governed by and construed in accordance with the internal laws of the Commonwealth of Massachusetts without giving effect to any choice or conflict of law provision or rule (whether of the Commonwealth of Massachusetts or any other jurisdiction) that would cause the application of laws of any jurisdictions other than those of the Commonwealth of Massachusetts. THE PARTIES HERETO WAIVE ANY RIGHT THEY MAY HAVE, AND AGREE NOT TO DEMAND, A TRIAL BY JURY.

4.5. NOTICES. All notices, instructions, demands, claims, requests and other communications given hereunder or in connection herewith shall be in writing. Any such communication shall be sent either (a) by registered or certified mail, return receipt requested, postage prepaid, or (b) via a reputable nationwide overnight courier service, in each case to the address set forth below. Any such communication shall be deemed to have been delivered two business days after it is sent by registered or certified mail, return receipt requested, postage prepaid, or one business day after it is sent via a reputable nationwide overnight courier service.

| | |
|---|---|
| To Aspen: | Aspen Technology, Inc.<br>Ten Canal Park Cambridge, Massachusetts 02141<br>Facsimile:  617.577.0722<br>Attention:  Chief Executive Officer |
| WITH A COPY TO: | Hale and Dorr LLP<br>60 State Street<br>Boston, Massachusetts  02109<br>Facsimile:  617.526.5000<br>Attention:  Mark L. Johnson |
| To any Stockholder: | At such Stockholder's address of record in the stock transfer records of Aspen |
| WITH COPIES TO: | Sher Garner Cahill Richter Klein<br>McAlister & Hilbert, L.L.C.<br>909 Poydras Street, 28th Floor<br>New Orleans, Louisiana  70112<br>Facsimile:  504.299.2300<br>Attention:  Steven I. Klein |

WITH COPIES TO (WITH RESPECT TO THOSE
NOTICES TO JAMES B. BASSICH, MICHAEL S.
BENBOW, KENNETH P. CALLAWAY, MARCUS M.
CHEVIS, ROBERT W. PHILLPOTT,
PONTCHARTRAIN TECHNOLOGY, INC., AND
CLAYTON J. WHITE):

                          Carver, Darden, Koretzky, Tessier,
                          Finn, Blossman & Areaux, L.L.C.
                          1100 Poydras Street, Suite 2700
                          New Orleans, Louisiana  70163
                          Facsimile:  504.585.3810
                          Attention:  Raymond G. Areaux

Any party hereto may give any notice, instruction, demand, claim, request or
other communication hereunder using any other means (including personal
delivery, expedited courier, messenger service, telecopy, telex, ordinary mail
or electronic mail), but no such communication shall be deemed to have been duly
given unless and until it actually is received by the party for which it is
intended. Any party hereto may change the address to which notices,
instructions, demands, claims, requests and other communications hereunder are
to be delivered by giving the other parties hereto notice in the manner set
forth in this Section 4.5.

    4.6.  SEVERABILITY. Any term or provision of this Agreement that is invalid
or unenforceable in any circumstances in any jurisdiction shall not affect the
validity or enforceability of the remaining terms and provisions hereof or the
validity or enforceability of the offending term or provision in any other
circumstances or in any other jurisdiction. If the final judgment of a court of
competent jurisdiction declares that any term or provision hereof is invalid or
unenforceable, the parties hereto agree that the court making the determination
of invalidity or unenforceability shall have the power to limit the term or
provision, to delete specific words or phrases, or to replace any invalid or
unenforceable term or provision with a term or provision that is valid and
enforceable and that comes closest to expressing the intention of the invalid or
unenforceable term or provision, and this Agreement shall be enforceable as so
modified.

    4.7. SIGNATURES. This Agreement may be executed in counterparts, each of
which shall be deemed an original but all of which together shall constitute one
and the same instrument. This Agreement may be executed by facsimile signature.

                              * * *

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above.

ASPEN TECHNOLOGY, INC.

By /s/ Mary A. Palermo
-------------------------------------------
   Title: Mary A. Palermo

STOCKHOLDERS:

ADVANTAGE CAPITAL PARTNERS VI, LIMITED

By:  Advantage Capital NOLA VI, L.L.C.,
     as General Partner

        By: /s/ Steven Stull
        -------------------------------------
        Steven Stull, Managing Member

ADVANTAGE CAPITAL PARTNERS VII, LIMITED

By:  Advantage Capital NOLA VII, L.L.C.,
     as General Partner

        By: /s/ Steven Stull
        -------------------------------------
        Steven Stull, Managing Member

ADVANTAGE CAPITAL PARTNERS VIII, LIMITED

By:  Advantage Capital NOLA VIII, L.L.C.,
     as General Partner

        By: /s/ Steven Stull
        -------------------------------------
        Steven Stull, Managing Member

ADVANTAGE CAPITAL PARTNERS X, LIMITED

By: Advantage Capital NOLA X, L.L.C.,
    as General Partner

        By: /s/ Steven Stull
        -------------------------------------
        Steven Stull, Managing Member

/s/ James B. Bassich
-------------------------------------------
JAMES B. BASSICH

/s/ Michael S. Benbow
-------------------------------------------
MICHAEL S. BENBOW

/s/ Kenneth P. Callaway
-------------------------------------------
KENNETH P. CALLAWAY

-12-

```
/s/ Marcus M. Chevis
-------------------------------------------
MARCUS M. CHEVIS

COMPUTERIZED PROCESSES UNLIMITED, L.L.C.


By: /s/ Marcus M. Chevis
    ---------------------------------------
    Marcus M. Chevis, President

F/V SOFTWARE, L.L.C.


By: /s/ David J. Erath
    ---------------------------------------
    Name: David J. Erath, Authorized
          Representative


/s/ Robert W. Phillpott
-------------------------------------------
ROBERT W. PHILLPOTT

PONTCHARTRAIN TECHNOLOGY, INC.


By: /s/ Marcus M. Chevis
    ---------------------------------------
    Name: Marcus M. Chevis

/s/ Clayton J. White
-------------------------------------------
CLAYTON J. WHITE
```

-13-

SCHEDULE I

| NAME | NUMBER OF SHARES OF ASPEN COMMON |
|------|----------------------------------|
| Advantage Capital Partners VI, Limited<br>LL&E Tower, Suite 2230<br>909 Poydras Street<br>New Orleans, Louisiana  70112 | 44,467 |
| Advantage Capital Partners VII, Limited<br>LL&E Tower, Suite 2230<br>909 Poydras Street<br>New Orleans, Louisiana  70112 | 32,447 |
| Advantage Capital Partners VIII, Limited<br>LL&E Tower, Suite 2230<br>909 Poydras Street<br>New Orleans, Louisiana  70112 | 11,054 |
| Advantage Capital Partners X, Limited<br>LL&E Tower, Suite 2230<br>909 Poydras Street<br>New Orleans, Louisiana  70112 | 8,658 |
| James B. Bassich<br>3004 Coliseum Street<br>New Orleans, Louisiana  70115 | 29,158 |
| Michael S. Benbow<br>7300 Lakeshore Drive #38<br>New Orleans, Louisiana  70124 | 29,158 |
| Kenneth P. Callaway<br>4609 Dreyfous Avenue<br>Metairie, Louisiana  70006 | 29,158 |
| Marcus M. Chevis<br>4421 Burke Drive<br>Metairie, Louisiana  70003 | 14,579 |
| Computerized Processes Unlimited, L.L.C.<br>4200 S. I-10 Service Road S., Suite 205<br>Metairie, Louisiana  70001 | 27,081 |
| F/V Software, L.L.C.<br>650 Poydras Street, Suite 2710<br>New Orleans, Louisiana  70130 | 96,629 |
| Robert W. Phillpott<br>1007 Division Street<br>Metairie, Louisiana  70001 | 29,158 |

I-1

| NAME | NUMBER OF SHARES OF ASPEN COMMON |
| ---- | -------------------------------- |
| Pontchartrain Technology, Inc.<br>4200 S. I-10 Service Road S., Suite 205<br>Metairie, Louisiana  70001 | 2,338 |
| Clayton J. White<br>3810 S. Post Oak Avenue<br>New Orleans, Louisiana  70131 | 14,579 |

I-2